**Alexandria**

JAIME TRAVERSO

v.

COMMONWEALTH OF VIRGINIA

No. 0953-86

Decided April 5, 1988

Counsel

E. William Chapman, David C. Culbert (Hazel, Thomas, Beckhorn & Hanes, P.C., on brief), for appellant.

Margaret Poles Spencer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

Opinion

**MOON, J.** — A jury impanelled in Loudoun County convicted the appellant of first degree murder and recommended a sentence of life imprisonment. The dispositive question on appeal asks whether the Commonwealth proved venue under Code § 19.2-247 by demonstrating that the victim's body was found in Loudoun County, Virginia. We reverse because under no interpretation of the law describing the Virginia/Maryland boundary could one determine that the victim's body was found in Loudoun County, Virginia.

Two boaters first saw the decedent's body in the Potomac River on July 30, 1985. Testimony at trial established that the body lay between six and seven and one-half feet from the Virginia shore. Generally, Code § 19.2-244 governs the determination of venue: "Except as otherwise provided by law, the prosecution in a criminal case shall be had in the county in which the offense was committed." In the instant case, however, the Commonwealth conceded during discovery that it did not know where the murder occurred. Thus, Code § 19.2-247 delineated the germane principles for determining whether venue could lie in Loudoun County. Code § 19.2-247 provides:

> Where evidence exists that a homicide has been committed either within or without this State, under circumstances which make it unknown where such crime was committed, the offense shall be amenable to prosecution in the courts of the county or city where the body may be found as if the

offense had been committed in such county or city.

Hence, venue would have been proper in the Circuit Court of Loudoun County only if the body were found within the county.

Code § 7.1-7 defines the boundary between Virginia and Maryland by stating that the dividing line runs with the Potomac River's low water mark as it "meanders" along the Virginia shoreline. The section also provides that where there exist "headlands," the low water mark, and hence the boundary, is measured by drawing a line from one headland to the next. The section finally states that where there are indentations, bays, creeks, inlets, or affluent rivers, then the low water mark does not follow their contours into Virginia, but rather follows a straight line drawn from one "headland" to the next.

At trial Richard Webber provided the testimony for the Commonwealth pertaining to where the Virginia/Maryland boundary lay. Webber directed the Loudoun County Department of Natural Resources, which oversees the county's maps. He gave no opinion as to whether the decedent's body was found in Virginia or Maryland. He asserted that on the maps introduced at trial, the drafters could not cartographically accurately represent the boundary between the two states. Webber proffered no definition of the term "headlands." However, on cross-examination, in response to a leading question, Webber agreed that only when a creek or other body of water entered the river, would one exercise cartographic license and draw a boundary across the water where no shoreline existed. Under the facts at bar, no creek or other body of water entered the Potomac in the immediate vicinity of the body's location.

The defendant introduced the testimony of William B. Chamberlain, an expert in surveying. Chamberlain opined that the victim's body lay in Maryland on the day it was found. He also asserted that the word "headland" in Code § 7.1-7 referred only to the two most prominent points of land present where streams and creeks enter the channel of the Potomac River. Chamberlain had visited the scene at McKinney's Landing after the body was found and testified that on the day he visited the spot, the water level was approximately the same as the day the body was found. He further recounted that at these times the level of the Potomac was also the actual low water mark. Therefore, if

there existed no "headlands" within the meaning of Code § 7.1-7, the body clearly would have been found six to seven and one-half feet beyond the low water mark which delineated the Virginia boundary.

At trial, the defendant also introduced evidence for the purpose of showing that no headlands encompassed the area where the decedent's body was found. During the questioning of Chamberlain, defense counsel attempted to demonstrate that if the definition of "headland" were not restricted to the points of land at the meeting of two bodies of water, then portions of land long recognized as Maryland territory would fall within the boundaries of Virginia. In particular, if one were to designate prominent points of land jutting into the river, and draw lines between them, argued the defendant, then large parts of Mason Island and Harrison Island, which have always been in Maryland, would appear to be in Virginia.

At the close of all the testimony, the defendant moved to strike the evidence on the grounds that since there were no headlands in the vicinity of the victim's body, the Commonwealth had not proven venue. The trial judge rejected the defendant's contentions by pointing to the language in Code § 7.1-7, which states that the boundary will run from the low water mark at one headland to the low water mark at the next headland without "following indentations, bays, creeks, inlets, or affluent rivers". The word "indentations," found the court, referred to natural curves in the Virginia shoreline and not to abutting bodies of water. After deciding that headlands could exist in the absence of abutting bodies of water, the court determined that a reasonable juror could find in the evidence presented two headlands which would create an outermost boundary encompassing the decedent's body. Accordingly, the motion to strike was denied.

█ Well established principles dictate that the Commonwealth bears the burden of proving venue by evidence which is either direct or circumstantial. *Pollard v. Commonwealth*, 220 Va. 723, 725, 261 S.E.2d 328, 330 (1980); *Keesee v. Commonwealth*, 216 Va. 174, 175, 217 S.E.2d 808, 809 (1975). On appeal, the Commonwealth has argued that the trial court properly submitted the question of venue to the jury. We agree that the exact physical location of the body within the river constituted a factual question which the jury could appropriately decide. *See Early v. Common-*

*wealth*, 93 Va. 765, 767, 24 S.E. 936, 937 (1896). However, the exact location of the boundary between Virginia and Maryland involves an interpretation of Code § 7.1-7 and represents a legal question outside the jury's province. If it were impossible for the jurors to interpret the evidence concerning the body's exact placement so as to conclude under Code § 7.1-7 that the body lay in Virginia, then the trial court should not have submitted the issue of venue to the jury.

When considering the sufficiency of the evidence on appeal of a criminal conviction, we must view all the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom. *Gooden v. Commonwealth*, 226 Va. 565, 571-72, 311 S.E.2d 780, 784 (1984); *Henry v. Commonwealth*, 2 Va. App. 194, 197, 342 S.E.2d 655, 656 (1986). The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it. *Stockton v. Commonwealth*, 227 Va. 124, 145-46, 314 S.E.2d 371, 385, *cert. denied*, 469 U.S. 873 (1984); *Sutphin v. Commonwealth*, 1 Va. App. 241, 243, 337 S.E.2d 897, 898 (1985); Code § 8.01-680.

Applying these general principles, we find that even when viewing the evidence in the light most favorable to the Commonwealth, there existed no possible interpretation of the facts which would have allowed the jurors to conclude that the body lay in Loudoun County. We note first that we do not determine whether the trial court correctly interpreted the word "headlands" in Code § 7.1-7. It is not necessary to promulgate a binding definition of "headlands" in order to reach our decision because we find that even under the definition adopted by the trial court, the evidence was insufficient as a matter of law to support a conclusion that the body lay in Virginia.

At trial, all parties agreed the body was found six to seven and one-half feet from the Virginia shoreline. Furthermore, the only evidence introduced concerning the low water mark showed that on the day the body was found, the river level was at the actual low water mark. Therefore, unless a line could be drawn between two headlands in order to form a new low water mark, the body's placement would have been six to seven and one-half feet beyond the Virginia border.

A careful review of the maps and pictures presented as evidence shows no basis for one to determine that there existed two headlands which would create a new low water mark. Even under the trial court's determination that headlands may exist at an indentation not created by an abutting body of water, we can find no evidence of any such indentation encompassing the point where the victim's body was found.

Pictures introduced at trial depicted the precise location of the body near an island in the Potomac. At oral argument, the Commonwealth conceded that only by considering the island's tip as a headland and drawing a line from the shoreline to the island, could the Commonwealth prove that the body lay in Virginia. However, the Commonwealth's own witness, Richard Webber, testified that the island in question was in Maryland. All maps introduced at trial further reflect that the island lies in the State of Maryland. Thus, the Commonwealth may not establish venue by claiming the island as its own.

We conclude, therefore, that because the victim's body lay six to seven and one-half feet from the Commonwealth of Virginia, venue did not lie in Loudoun County and the appellant's conviction must be reversed.

*Reversed.*

Duff, J., and Keenan, J., concurred.