## Salem
## BARBARA JO ARCHIE
v.
## COMMONWEALTH OF VIRGINIA
No. 1631-90-3
Decided June 16, 1992

Counsel

Raphael B. Hartley III (Edward M. Jasie, on brief), for appellant.

Virginia B. Theisen, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

Opinion

**KOONTZ, C.J.**—In a jury trial, Barbara Jo Archie (Archie) was convicted of first degree murder for the death of Audra Kinder (Audra) and sentenced to life imprisonment. She contends: (1) the evidence was insufficient to sustain the conviction, and (2) the trial court erred in limiting the testimony of Dr. Scott, a psychiatrist, regarding an interview with Archie during which she was sedated with sodium amytal. We find that sufficient evidence supports Archie's conviction for first degree murder and that the trial court properly limited Dr. Morgan Scott's testimony of the sodium amytal interview.

At the time of her death on February 4, 1989, Audra, who was three years old, lived with her father, Gary Kinder (Gary), who had custody of her. Gary's girlfriend, Barbara Jo Archie, and Archie's daughter, Candice, also lived there. Audra came to live with Archie and Gary in October 1988 following a custody dispute between Gary and Tammy Kinder (Tammy), Audra's mother. Tammy had visitation rights with her daughter, but no longer had joint custody of Audra. Gary had filed complaints with the department of social services charging Tammy with sexually abusing Audra.

On Saturday morning, February 4, 1989, Gary got up around 8:00 a.m. After spending some time with Audra, Gary left the home to go to work. After Gary had been at work for about one half hour, he received a call from Archie, who sounded hysterical. Archie told Gary that Audra would not get up. Gary rushed home and found Audra lying in a living room chair. The back of her head was swollen and puffy. She was breathing but would not wake up. Archie told Gary that she had called for an ambulance.

M.A. Adams, the emergency medical technician who arrived at the home, testified that Archie showed no emotion. He also testified that Archie told him that she had seen Audra fall and hit her head on the door. Audra was taken to Roanoke Memorial Hospital.

Dr. Thomas Kayrouz examined Audra at Roanoke Memorial. He testified that Audra was unconscious and not breathing on her own upon arrival at the hospital. The CT scan showed a large subdural hematoma which had bled into the brain. Dr. Kayrouz

testified that when he spoke to Gary and Archie at the hospital, Archie appeared "[s]omewhat stoic, somewhat of a blank appearance on the face" with "no real inflection of tone in the voice or outward emotional concern." Archie told Dr. Kayrouz that she heard a thud and heard Audra cry out, then saw the child lying face up. Dr. Kayrouz testified that the massive brain injury Audra suffered could not have been caused in the manner described by Archie.

Audra died on February 5, 1989. Dr. Oxley, who performed the autopsy on February 6, concluded that the cause of death was a skull fracture with hematoma and bruising of the brain. Dr. Oxley testified that there were various bruises on the child's body and a large area of hemorrhage in the abdomen. He stated that the abdominal injury had been caused by a penetrating blow to a relaxed abdomen. He also noted a fractured arm and wrist. Dr. Oxley described these fractures as incomplete fractures, the type commonly caused by a jerking, twisting motion. Dr. Oxley determined that the skull fracture was caused by "multiple injuries, multiple impact."

On February 3, 1989, the evening before the incident, Archie received notice that Tammy had filed a complaint with social services against her concerning her spanking of Audra. That evening, Archie called Sharon Lowery (Sharon), Gary's sister. Archie told Sharon that she did not know how much more she could take. Archie said she was afraid that social services would take her own daughter, Candice, away from her. Archie repeatedly said she would "get" Tammy.

On the evening of February 4, 1989, Archie told Sharon that she heard a noise and turned around and saw Audra lying on the floor. Archie told Sharon that Audra had fallen off a stool. The next morning, February 5, Archie told Sharon that Audra had fallen off the chair in the living room.

Linda Johnson, an employee with the Giles County Department of Social Services, testified that she spoke to Archie on February 5 at the hospital. Johnson testified that Archie told her what had happened the previous morning. Archie told Johnson that she had been in the kitchen when "she heard a thump, walked back toward where Audra had been, called her name and got no answer." Johnson also testified that Archie stated that "she then saw Audra

lying next to the front door" and Audra "was on her back, her head was on the carpet." Johnson testified that Archie appeared "very unemotional." According to Johnson, Archie "was not crying, she had a very steady voice, . . . she did not get upset while describing what occurred to the child."

On February 5, Investigator Gary R. Price spoke with Archie at the hospital. Price testified that Archie told him that she was walking toward the kitchen when she heard a noise and turned and found Audra laying on the floor. Archie told Price that she had not seen Audra fall.

Gary testified that after Audra's death, Archie called him from the jail. When Gary asked what happened to Audra, Archie asked Gary if he would believe that Audra fell off the porch.

At trial, Archie pled not guilty by reason of insanity. Dr. Morgan Scott, a psychiatrist, had conducted an interview with Archie prior to trial during which Archie was sedated with the drug sodium amytal. Defense counsel sought to introduce testimony from Dr. Scott regarding his observations of Archie during the sodium amytal interview and testimony as to what Archie had said while under the influence of sodium amytal. Out of the presence of the jury, Dr. Scott was questioned concerning the evaluation tools he had used with Archie during the interview. Dr. Scott testified that he used sodium amytal because Archie could not remember pertinent events. Dr. Scott testified that he asked leading and suggestive questions during the interview.

The court viewed the videotape of the interview. The court ruled that Dr. Scott could testify that as a result of his observation of Archie while under the influence of the drug, he was able to form an opinion. The court also ruled that Dr. Scott could state what that opinion was. However, the court ruled that Dr. Scott could not say what he observed of Archie while she was under the influence of the drug.[1]

---

[1] The trial court permitted Archie to testify as to matters she could recall without the assistance of the sodium amytal. She testified at trial that while she was in jail she heard thumps and remembered shaking Audra. She testified that there was a time lapse, when Audra was being injured, which she could not recall. Archie also stated that she could not recall what she had told people about what had happened.

■ We first address Archie's contention that the evidence was insufficient to support her conviction. When reviewing the sufficiency of the evidence on appeal, we are guided by well-established principles. We view "all the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom." *Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988). Moreover, "[t]he jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it." *Id.*

■ To prove premeditated murder, the Commonwealth must establish: "(1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Rhodes v. Commonwealth*, 238 Va. 480, 486, 384 S.E.2d 95, 98 (1989). Premeditation requires the formation of a specific intent to kill. *Id.* at 485, 384 S.E.2d at 98 (citing *Smith v. Commonwealth*, 220 Va. 696, 700, 261 S.E.2d 550, 553 (1980)). The crux of Archie's contention is that the evidence was insufficient to prove a specific and premeditated intent to kill.

■ In *Rhodes*, the Court noted that "[p]remeditation and formation of an intent to kill seldom can be proved by direct evidence. A combination of circumstantial factors may be sufficient." *Id.* at 486, 384 S.E.2d at 98 (citing *Epperly v. Commonwealth*, 224 Va. 214, 232, 294 S.E.2d 882, 892-93 (1982)). In determining whether a defendant formed a premeditated and specific intent to kill, the trier of fact may consider the following factors: (1) the brutality of the attack, and whether more than one blow was struck; (2) the disparity in size and strength between the defendant and the victim; (3) the concealment of the victim's body; (4) the defendant's lack of remorse and efforts to avoid detection; and (5) motive. *Epperly*, 224 Va. at 232, 294 S.E.2d at 892-93. We review the evidence supporting each of the factors.

With regard to the first factor in *Epperly,* the jury heard considerable testimony concerning the nature and extent of the victim's injuries. Dr. Kayrouz, a pediatrician from Roanoke Memorial Hospital, testified that the massive brain injury that Audra sustained required the application of substantial force. He described the injury as the type "probably associated with . . . hitting the skull [with a flat object or a large round object] and the

brain being shaken severely from the blunt trauma." Dr. Oxley, who performed the autopsy, noticed various bruises on the child's head, face, chest, arms, buttocks and legs. He also noticed a large area of hemorrhage in the abdomen. He testified that the abdominal injury is "characteristic of a blow, a kick, a penetrating impact to the relaxed abdomen." Additionally, Dr. Oxley testified that the skull fracture was caused by "multiple injuries, multiple impact." He also stated that the left arm and right wrist were fractured. He described these injuries as incomplete fractures, "commonly caused by a jerk or a twisting motion." This evidence demonstrated that the attack was particularly brutal and that a significant number of blows were struck.

The jury was also entitled to consider the disparity in size and strength between the victim and Archie. At the time of the incident, Audra was three-years-old. Archie, on the other hand, had the size and strength of a grown woman.

The fourth factor in *Epperly* concerns the accused's lack of remorse and efforts to avoid detection. Dr. Kayrouz testified that when he spoke to Gary and Archie at Roanoke Memorial Hospital, Archie appeared "[s]omewhat stoic, somewhat of a blank appearance on the face" with "no real inflection of tone in the voice or outward emotional concern." The emergency medical technician, who arrived at the residence just moments after the call, testified that Archie showed no emotion. Linda Johnson, from the Giles County Department of Social Services, stated that during an interview, Archie appeared "very unemotional" and was not crying or upset. This testimony provided sufficient evidence from which the jury reasonably could have found that Archie demonstrated a lack of remorse. Moreover, Archie continued to deny her involvement in Audra's death and gave several inconsistent versions of how Audra had been injured. From this evidence, the jury reasonably could have found that Archie's denials and inconsistent accounts were made in an attempt to avoid detection, and thus blame, for the injuries Audra sustained.

Finally, we consider the evidence of motive. The Supreme Court has stated that although motive is not a necessary element of the crime of first degree murder, "it is relevant and often most persuasive upon the question of the actor's intent." *Epperly*, 224 Va. at 232, 294 S.E.2d at 892-93. Gary testified that he had focused a lot of attention on Audra during the custody dispute with

Audra's mother. He testified that Archie stated that things were fine until Audra came to live with them and that she suggested that Audra go live with her mother so that she and Gary could get on with their lives. The testimony also showed that Archie was very upset with Audra for her bed-wetting. On one occasion, Archie burned a mattress that Audra had wet. Also, Archie and Tammy had gotten into a fight at the Kinder home, which led to both women filing assault charges. Sharon Lowery testified that Archie said that she could not stand to see Audra because Audra looked so much like Tammy. The day before the incident, Archie received notice that Tammy had filed a complaint with the department of social services against her for spanking Audra. The night before the incident, Archie told Sharon that she did not know how much more she could take. Archie said she was afraid that social services would take her own daughter, Candice, away from her. Archie repeatedly said she would "get" Tammy. Archie testified that she was concerned that Candice would be adversely affected by Audra's behavior.

Archie contends that the facts here are similar to those presented in *Rhodes*. In *Rhodes*, the Supreme Court reversed a conviction for first degree murder where the evidence supported only two of the five *Epperly* factors. However, the Court was careful to note that it did "not mean to suggest that each and every factor mentioned in *Epperly* is essential to the application of the rule applied there." *Rhodes*, 238 Va. at 487, 384 S.E.2d at 99.

> As our decision in that case illustrates, we will affirm a conviction of premeditated murder, even though based upon wholly circumstantial evidence, whenever we can say that the reasonable import of such evidence, considered as a whole, is sufficient to show beyond a reasonable doubt that the accused was the criminal agent and that he acted with a premeditated intent to kill.

*Id.* Although there was no suggestion that Archie attempted to conceal Audra's body, there was evidence supporting each of the other four factors. Consequently, we find that the evidence presented was sufficient to permit the jury to find that Archie had formed the specific and premeditated intent to kill Audra.

Next, we must decide whether the trial court erred in ruling that Dr. Morgan Scott could not testify to his observations of

Archie during the sodium amytal interview and what Archie said while under the influence of that drug. As a preliminary matter, we address the Commonwealth's contention that Archie cannot challenge the trial court's ruling because she failed to proffer the excluded testimony. The law is well established that an appellate court will not consider an error assigned to the rejection of testimony unless a proper proffer of such testimony be made a part of the record. *Stewart v. Commonwealth*, 10 Va. App. 563, 568, 394 S.E.2d 509, 512 (1990) (citing *Whittaker v. Commonwealth*, 217 Va. 966, 969, 234 S.E.2d 79, 81 (1977)). Upon review of the record, we find that defense counsel made a sufficient proffer of the excluded testimony so as to permit our review of the trial court's ruling. Dr. Scott testified, out of the presence of the jury, about the nature and content of the sodium amytal interview with Archie. Moreover, the videotape of the interview was viewed by the court and counsel out of the presence of the jury, and was made a part of the record. Finding that this proffer of the excluded evidence is sufficient to permit our review, we address the merits of the issue.

■ Our resolution of this issue is controlled by the Supreme Court's holding in *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974). In *Greenfield*, the defendant challenged a ruling of the trial court prohibiting defendant's psychiatrist from stating what the defendant said during hypnosis. The Court found no error in the trial court's ruling, and held that hypnotic evidence, either in the form of in-court testimony by a witness who was at that time hypnotized, or testimony as to what the person said while under hypnosis, is inadmissible. *Greenfield*, 214 Va. at 716, 204 S.E.2d at 419. The Court noted that hypnotic evidence is unreliable because a person under hypnosis can manufacture or invent false statements and is subject to heightened suggestibility:

> "The hypnotized person is ultrasuggestible, and this manifestly endangers the reliability of his statements. The courts have recognized to some extent the usefulness of hypnosis, as an investigative technique and in diagnosis and therapy. However, they have rejected confessions induced thereby, statements made under hypnosis when offered by the subject in his own behalf, and opinion as to mental state based on hypnotic examination."

*Id.* at 715-16, 204 S.E.2d at 419 (quoting McCormick, *Law of Evidence* § 208 (2d ed. 1972)). *See also Hopkins v. Commonwealth*, 230 Va. 280, 337 S.E.2d 264 (1985), *cert. denied*, 475 U.S. 1098 (1986); *Hall v. Commonwealth*, 12 Va. App. 198, 403 S.E.2d 362 (1991).

 We find that the analysis in *Greenfield* concerning the admissibility of hypnotic evidence is equally applicable to the admissibility of evidence derived from a drug-induced interview. As the Supreme Court recognized, " '[d]eclarations made under hypnosis have been treated judicially in a manner similar to drug-induced statements.' " *Greenfield*, 214 Va. at 715, 204 S.E.2d at 419 (quoting McCormick, *supra*, § 208). "Sodium amytal is a hypnotic sedative." *The Slone-Dorland Annotated Medical-Legal Dictionary* 24 (1987).

Sodium amytal, commonly known as "truth serum," actually only relaxes psychological defense mechanisms that prevent the individual from consciously remembering certain events; this allows the denied or repressed material to surface. Under the influence of sodium amytal, individuals may reveal thoughts and memories that, for various psychological reasons, they could not previously express.

Bonnie & Slobogin, *The Role of Mental Heath Professionals in the Criminal Process: The Case for Informed Speculation*, 66 Va. L. Rev. 427, 506 n.234 (1980). Evidence derived from a subject while under the influence of sodium amytal poses the same dangers as hypnotic evidence.

Because an individual who is under the influence of sodium amytal is highly suggestible, examiners must avoid leading questions. Second, although the technique can be helpful in interrogating persons who are inclined to tell the truth, a person who intends to deceive probably will be able to continue the deception whether drugged or under hypnosis. Finally, the subject may be prone to substitute his fantasies for what actually occurred, due to amytal's tendency to promote temporary regression to less mature levels.

Bonnie & Slobogin, *supra*, at 506-07 n.235 (citations omitted). For this reason, testimony induced by sodium amytal is generally regarded as unreliable, and many states have excluded testimony

regarding statements elicited from a defendant while under the influence of sodium amytal. *E.g.*, *State v. Pitts*, 562 A.2d 1320, 1348 (N.J. 1989) (recognizing that "the scientific community continues to view testimony induced by sodium amytal as unreliable to ascertain truth").

■ "The standard of review on appeal where the admissibility of expert testimony is challenged is whether the trial court abused its discretion." *Kern v. Commonwealth*, 2 Va. App. 84, 86, 341 S.E.2d 397, 398 (1986) (citing *Thorpe v. Commonwealth*, 223 Va. 609, 614, 292 S.E.2d 323, 326 (1982)). Dr. Scott stated that he asked leading and suggestive questions during the sodium amytal interview. The trial court had the opportunity to view the videotape of the interview and evaluate the techniques used to elicit Archie's responses. Under the authority of *Greenfield*, the observations Dr. Scott made of Archie and the statements Archie made while under the influence of sodium amytal were properly excluded. Consequently, we find no abuse of discretion in the trial court's limitation of Dr. Scott's testimony.

Moreover, the trial court did permit Dr. Scott to testify "that as a result of his observation of [Archie] while she was under the influence of this drug that he was able to form an opinion."[2] Dr. Scott was permitted to tell the jury that in his opinion Archie experienced a brief reactive psychosis, which is "temporary insanity."[3] He further stated that in a brief psychotic episode one may injure another without intending to do so. Because Dr. Scott testified that Archie was temporarily insane at the time of

---

[2] The trial court permitted Dr. Scott to testify about his initial interviews with Archie before the sodium amytal session. Dr. Scott testified that Archie told him that something had come over her on Friday evening. Archie stated that on the morning of the incident, she was changing Audra's clothes and the next thing she knew she was shaking Audra, and that Audra's eyes had rolled back in her head. Dr. Scott also testified that Archie stated that she could not accept that she had killed Audra, but felt that Audra's mother had done it. Because the issue has not been presented to us on appeal, we do not address the admissibility of this evidence.

[3] In rebuttal, the Commonwealth called Dr. Dennis Cropper, a forensic evaluator and clinical director for Mental Health Services of the New River Valley. He testified that based on his evaluation of Archie, "there was no evidence of any significant mental illness which would have effected [sic] [Archie's] actions at the time [of Audra's injuries]." He further testified that he found no evidence of a brief reactive psychosis.

Audra's injuries, we find no prejudice to Archie. For these reasons, the conviction for first degree murder is affirmed.

*Affirmed.*

Coleman, J., and Elder, J., concurred.