LANCE ANTONIO CHANDLER

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 940975 and 940976

March 3, 1995

Present: All the Justices

*Buddy A. Ward* for appellant.

*Linwood T. Wells, Jr., Assistant Attorney General (James S. Gilmore, III, Attorney General*, on brief), for appellee.

JUSTICE LACY delivered the opinion of the Court.

In this appeal, we review the capital murder conviction and death penalty imposed upon Lance Antonio Chandler, along with his convictions for use of a firearm in the commission of murder, robbery, conspiracy to commit robbery, and use of a firearm in the commission of a robbery.

## I. Proceedings

Chandler was tried in the Circuit Court of Halifax County upon indictments charging capital murder, use of a firearm in the commission of capital murder, robbery, use of a firearm in the commission of a robbery, and conspiracy to commit robbery. Code §§ 18.2-31(4), -53.1, -58, -22(a)(2). At the conclusion of the first stage of a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, the jury convicted Chandler of all offenses and fixed the following sentences: 25 years' imprisonment for robbery, 2 years for each of the firearm counts, and 10 years for conspiracy.

Following the presentation of evidence at the penalty phase of the capital murder trial, the jury fixed Chandler's punishment at death based on the future dangerousness predicate. After considering the probation officer's report and conducting a sentencing hearing, the trial court imposed all the sentences fixed by the jury.

We have consolidated Chandler's appeal of his capital murder conviction in Record No. 940975 with the automatic review of his death sentence to which he is entitled, Code §§ 17-110.1(A) and -110.1(F), and have given them priority on our docket. Code § 17-110.2. We also have certified Chandler's appeal of his non-capital murder convictions from the Court of Appeals, Record No. 940976, and have consolidated the two appeals for consideration.

## II. The Evidence

We review the evidence in the light most favorable to the Commonwealth, the prevailing party at trial.

On the evening of February 7, 1993, Chandler and Geraldine Fernandez were drinking beer and "doing cocaine" at Fernandez's house. Sometime during the evening, Fernandez, Chandler, Dwight Wyatt, and George Boyd discussed robbing Mother Hubbard's, a local convenience store. Chandler told them they could get a gun from Henry Chappell. Chandler had previously given Chappell a fully-loaded revolver and had asked Chappell to hide the gun for him.

Fernandez drove the three men and Bernice Murphy, Chandler's girlfriend, to South Boston, where Wyatt retrieved the gun from Chappell. Wyatt opened the gun and saw that it was loaded. Chandler also checked the gun. Fernandez then drove to Mother Hubbard's, where the men got out of the car and went into the store. Before the men left the car, Wyatt gave the gun to Chandler.

Following their plan, Wyatt and Boyd went to the back of the store to steal some beer while Chandler stayed at the front. Chandler asked the store clerk, William Howard Dix, for money. Chandler had told his accomplices that Dix was "a little slow" and would not give them any trouble. Dix, however, did not react to Chandler's demands for the money. Chandler then pointed the gun at Dix, closed his eyes, and said "boom, boom" while he pulled the trigger. The gun did not go off. Chandler fired a second time and a bullet entered Dix's head through his upper lip. Chandler, Boyd, and Wyatt then ran from the store. Boyd was carrying a case of beer. During the robbery, Fernandez and Murphy had been driving around the area. When Fernandez saw the three men, she picked them up and drove away.

Around 11:00 p.m., Terry Hughes went into Mother Hubbard's and discovered Dix on the floor in a pool of blood, and called the rescue squad. Dix died from the gunshot wound. Dr. William Massello, the medical examiner, testified that the bullet had bruised Dix's spinal cord, which blocked brain signals and, in turn, paralyzed the muscles used in breathing.

## III. Pre-Trial Issues

### A. Change of Venue

Chandler assigns error to the trial court's refusal to grant a change of venue. Chandler claims that pre-trial newspaper coverage of the crimes subjected him to prejudicial pre-trial publicity. The newspaper articles included statements by the Commonwealth's attorney that Chandler was the individual who had killed Dix, that Chandler was a "likely candidate" for the death penalty, and that Chandler had sought a plea bargain.

■ A change of venue based on pre-trial publicity is required when the defendant demonstrates that there is "widespread" prejudice against him and that such prejudice would, with reasonable certainty, prevent a fair trial. *Mueller v. Commonwealth*, 244 Va. 386, 398, 422 S.E.2d 380, 388 (1992), *cert. denied*, 507 U.S. ____, 113 S.Ct. 1880 (1993). Whether to grant a motion for a change of venue is a matter of judicial discretion, and we will reverse the decision of the trial judge only for an abuse of that discretion. *Id.* at 398, 422 S.E.2d at 389.

Chandler relies on three articles which were published by the local newspapers to support his claim of prejudicial publicity. Chandler does not allege that the Commonwealth's attorney's statements reported in these articles were inaccurate. One of the articles was published nine months before trial and the remaining two appeared three months before trial. During the jury selection process it became clear that few of the prospective jurors had read or could remember the details of the articles. Of the original 60-member venire, only two individuals indicated that they had read the articles and could not give Chandler a fair trial. The trial court removed those two prospective jurors from the panel.

■ This record does not demonstrate that the pre-trial publicity in this case prejudiced Chandler and prevented him from receiving a fair trial. Therefore, the trial court did not abuse its discretion in denying Chandler's motion for a change of venue.

### B. Constitutionality of the Death Penalty

Chandler filed a pre-trial motion asking the trial court to declare the Virginia death penalty statutes unconstitutional on a number of grounds. The trial court denied that motion. On appeal, Chandler again raises some of the same issues, all of which we have considered and rejected in previous cases:

■ (1) Imposition of the death penalty does not violate the Eighth Amendment of the United States Constitution as repugnant to society's evolving standards of decency. *Mickens v. Commonwealth*, 247 Va. 395, 402, 442 S.E.2d 678, 683, *cert. granted and judgment vacated on other grounds*, 513 U.S. ____, 115 S.Ct. 307 (1994); *Smith v. Commonwealth*, 219 Va. 455, 476, 248 S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979).

■ (2) The Virginia statutes provide for adequate consideration of aggravating and mitigating circumstances. *Breard v. Commonwealth*, 248 Va. 68, 74, 445 S.E.2d 670, 674-75, *cert. denied sub nom. Breard v. Virginia*, ____ U.S. ____, 115 S.Ct. 442 (1994).

■ (3) The term "future dangerousness" is not unconstitutionally vague. *Mickens*, 247 Va. at 403, 442 S.E.2d at 684; *Smith*, 219 Va. at 477, 248 S.E.2d at 148-49.

■ (4) Allowing, but not requiring, a trial judge to reduce a sentence of death to life imprisonment on a showing of "good cause" is not unconstitutional. *Breard*, 248 Va. at 76, 445 S.E.2d at 675-76.

■ (5) Consideration of hearsay evidence or information in a presentence report during the sentencing phase of a capital murder case is not unconstitutional. *O'Dell v. Commonwealth*, 234 Va. 672, 701-02, 364 S.E.2d 491, 507-08, *cert. denied*, 488 U.S. 871 (1988).

■ (6) The procedures for appellate review of death penalty cases, including expedited review, provide a meaningful appeal and are constitutional. *Payne v. Commonwealth*, 233 Va. 460, 473-74, 357 S.E.2d 500, 508-09, *cert. denied*, 484 U.S. 933 (1987); *Smith v. Commonwealth*, 239 Va. 243, 253, 389 S.E.2d 871, 876, *cert. denied*, 498 U.S. 881 (1990).

We find nothing in Chandler's arguments here that warrants a change in our previous positions.

## IV. Jury Selection

Following the *voir dire*, the Commonwealth used peremptory strikes to remove three African-Americans from the panel: William Yarborough; Annie Ewell; and Robert Williams. Chandler argued at trial, as he does here, that because one-third of the members of the venire were African-American, the prosecution's three strikes constituted 60% of its available strikes. Chandler contends that using 60% of the strikes to remove Afri-

can-Americans from the jury panel was disproportionate and in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

The prosecution responded that it struck Yarborough based on his statements that he would find it difficult to impose the death penalty. Ewell was struck because she stated that she did not believe in the death penalty and because she was related to two individuals who had been prosecuted in the past and defended by Chandler's defense counsel. Finally, the Commonwealth struck Williams because he was "remarkably noncommunicative" during the *voir dire*.

When a party alleges that peremptory strikes were racially based in violation of *Batson*, the trial court must consider the basis of the challenges, the reasons proffered for the strikes, and any argument presented that such reasons, even if race-neutral, are pretextual, to determine whether the challenger has met his burden of proving purposeful discrimination in the selection of a jury panel. *Buck v. Commonwealth*, 247 Va. 449, 451, 443 S.E.2d 414, 415 (1994). In this case, the trial court concluded that Chandler had not sufficiently shown purposeful discrimination in the selection of the jury panel and that the reasons proffered by the Commonwealth were racially neutral. On appeal, this finding can be reversed only if it is clearly erroneous. *Id.*

Our review shows that the record supports the Commonwealth's stated reasons for the strikes in question. First, Yarborough clearly was either opposed to the death penalty in principle or could not have imposed it. When asked if he could fairly consider the death penalty, he responded that he could not answer the question simply "yes" or "no." Similarly, Ewell stated unequivocally that she did not believe in the death penalty under any circumstances. Furthermore, we have held that familial relationships with persons convicted of crimes are legitimate considerations in using peremptory strikes. *James v. Commonwealth*, 247 Va. 459, 462, 442 S.E.2d 396, 398 (1994). These justifications, therefore, were valid, race-neutral reasons for using peremptory strikes to remove Yarborough and Ewell from the panel.

Williams was also properly struck from the panel. As demonstrated by the record, Williams's responses during *voir dire*, which included "No," "Yes sir," "No, I don't," and "I'm comfortable with the prosecution," were generally brief, simplistic, and without elaboration. These answers support the Commonwealth's claim that he was "remarkably noncommunicative." Chandler did

not specifically challenge the Commonwealth's rationale for striking Williams as racially biased or "pretextual," but merely reiterated his concern that striking three African-Americans was disproportionate. Other courts have recognized lack of responsiveness as a valid, race-neutral reason for exercising a peremptory strike. *See, e.g., Moore v. Keller Industries,* 948 F.2d 199, 202 (5th Cir. 1991), *cert. denied,* ____ U.S. ____, 112 S.Ct. 1945 (1992). Furthermore, those who were present during *voir dire* were able to observe Williams's demeanor as he was questioned. These in-court observations provide further information about a potential juror and may be incorporated into decisions made by the trial court. For these reasons, we give substantial deference to the decision of the trial court in this area. *Spencer v. Commonwealth,* 238 Va. 295, 307, 384 S.E.2d 785, 793 (1989), *cert. denied,* 493 U.S. 1093 (1990). Under these circumstances, the trial court's determination that the Commonwealth's use of its peremptory strikes was not racially motivated is not clearly erroneous and will be affirmed.

## V. Guilt Phase

### A. Admission Against Interest

During the guilt phase of the trial, John Holt, a special agent with the Virginia State Police, testified regarding a statement he had taken from Bernice Murphy as part of the murder investigation. In her statement, Murphy described riding in the car with Chandler, Fernandez, Boyd, and Wyatt to obtain the gun, and Chandler's discussion about "going in, robbing the store and leaving." In addition, Murphy's statement included comments about riding around the area while the men were in the store, picking them up when they came out of the store, and statements by Chandler when he returned to the car, including "why didn't the man open the register?" and "he got shot over money that wasn't even his." Holt testified that he terminated his interrogation of Murphy when she indicated that she thought she could be an accessory to the crimes because she was with the group.

The trial court admitted Holt's testimony regarding Murphy's statement over Chandler's objection. Chandler argued at trial, as he does here, that portions of Murphy's statement were not self-inculpatory but rather incriminated Chandler. Therefore, the statement should not have been admitted as a declaration against

penal interest, an exception to the hearsay rule. We disagree with Chandler.

 The statement clearly shows that Murphy went with Chandler and the others to the store, knowing their intentions to rob the store, and waited for them to return to the car to leave the scene of the crimes. This implicates her as an accomplice. The issue whether there was sufficient evidence to convict her on such a theory is not part of our inquiry here. Rather, in determining whether Murphy's statement was against her penal interest, the inherent reliability of her statement is established by her expressed belief that she could be charged as an accessory to the crimes. As Holt testified, Murphy said "she felt she could be an accessory to the crime, that she was with them." Finally, the reliability of Murphy's statement is buttressed by the testimony of Fernandez, which placed Murphy in the vehicle during the commission of the robbery and murder. As a result, the statement qualifies as admissible hearsay.[1] *Ellison v. Commonwealth*, 219 Va. 404, 408, 247 S.E.2d 685, 688 (1978) (citing *Hines v. Commonwealth*, 136 Va. 728, 117 S.E. 843 (1923)).

 Chandler argues that under the recent case of *Williamson v. United States*, ____ U.S. ____, 114 S.Ct. 2431 (1994), only those portions of the statement which directly implicate Murphy are admissible under this exception to the hearsay rule. Chandler contends that Murphy's statements regarding his accounts of the robbery would be inadmissible. *Williamson*, however, concerned the interpretation of the Federal Rules of Evidence, not applicable here. Furthermore, in the present case, Murphy's recitations of statements made by Chandler showed her knowledge of and complicity in the criminal act and exposed her to liability as an accessory to the crimes. Accordingly, Murphy's entire statement is admissible as a declaration against penal interest.

## B. Premeditation

Chandler assigns error to the trial court's denial of his motion to "strike the capital aspect of the murder charge," arguing that the Commonwealth failed to prove that he was guilty of capital

---

[1] To be an admissible declaration against penal interest, the statement must also be made by an unavailable declarant. *Ellison*, 219 Va. at 408, 247 S.E.2d at 688. We assume, without deciding, that the statement met this requirement as Chandler does not challenge Murphy's unavailability.

murder because there was no evidence of premeditation or an intent to kill. In support of this position, Chandler asserts that his testimony demonstrates that he did not intend to kill Dix. At trial, Chandler stated that when he opened the gun and looked at the cylinder, he saw "about three empty shell casings and one that still had the slug in it." Chandler testified that he thought that he would have to pull the trigger "at least four" times before a live round would fire, that he did not expect the gun to fire the second time he pulled the trigger, and that he was "[s]cared" when it went off, killing Dix.

The record, however, also shows that Chandler knew the gun was fully loaded when he gave it to Chappell and that Chandler had extra bullets for the gun in his pocket when he committed the robbery. In addition, Chandler knew Dix, and believed that Dix would not give him any trouble because he was "a little bit slow." The record also shows that, when Dix did not respond to Chandler's demand for money, Chandler pointed the gun at Dix, closed his eyes, said "boom, boom," and pulled the trigger twice.

Premeditation need not exist for any specific length of time. *Clozza v. Commonwealth*, 228 Va. 124, 134, 321 S.E.2d 273, 279 (1984), *cert. denied*, 469 U.S. 1230 (1985). The evidence here required the jury to decide whether they believed Chandler's testimony that he did not think the gun would go off until he pulled the trigger four times or whether Chandler planned to commit murder, either prior to entering the store with a loaded gun or as he fired twice at Dix's head. Taking the evidence in the light most favorable to the prevailing party, as we must do, we cannot say that the Commonwealth failed to produce evidence of premeditation, nor can we say that the jury's finding of premeditation was plainly wrong or without evidence to support it. *Beavers v. Commonwealth*, 245 Va. 268, 281-82, 427 S.E.2d 411, 421, *cert. denied*, ____ U.S. ____, 114 S.Ct. 171 (1993).

## VI. Sentencing

### A. Jury Sentencing

During jury deliberations on Chandler's sentence, the foreman of the jury informed the judge that the jury would like to know "the extent of life in prison on a capital murder charge. They would like to know if this individual is ever allowed parole." In response, the judge told the jury that they "should impose such

punishment as you feel is just under the evidence and within the instructions of the court. You are not to concern yourselves with what may happen afterwards."

■ Chandler contends that under the recent case of *Simmons v. South Carolina*, 512 U.S. ____, 114 S.Ct. 2187 (1994), the trial judge was required to respond to the jury's inquiry regarding the availability of parole. However, Chandler voiced no such objection at the time the trial judge responded to the jury's inquiry. His objection was not raised until the post-sentencing hearing, four months after the jury had returned its verdict. Chandler's failure to make a contemporaneous objection precludes consideration of this assignment of error here. Rule 5:25.

## B. Trial Court Review of Sentence

Chandler assigns as error the trial court's denial of his "motion to set aside the jury's recommended sentence to death as contrary to the law and the evidence." It is not clear, however, exactly which action of the trial court is challenged by this assignment of error. At the sentencing phase of the jury trial, no motion was made to set aside the jury's determination of future dangerousness and sentence of death as contrary to the law and evidence. The absence of such a motion is consistent with the fact that, at Chandler's insistence, no evidence in mitigation or argument of counsel was presented to the jury during the sentencing phase of the trial. This assignment of error, therefore, cannot be considered as a challenge to the sufficiency of the evidence to support the jury verdict fixing a sentence of death based on the future dangerousness predicate.

After the conclusion of the jury trial, Chandler changed his mind and decided to offer evidence in mitigation of his sentence. Consequently, at the sentencing hearing, the defense offered the testimony of Chandler and his minister. Chandler's counsel argued to the trial court, as he does here, that the death penalty is inappropriate under the circumstances of this case, that the jury's decision was made without the mitigation evidence subsequently provided to the trial judge, and that the trial court, considering all the evidence before it and looking at previous cases in which the death penalty was imposed, "is entitled to comply with [the jury's sentence of death] only if all the evidence supports it."

■ In this procedural posture, therefore, at this stage of our analysis the issue whether the jury's sentencing decision was sup-

ported by the evidence is not before us because no such motion was ever made before the trial court. Chandler seeks to have the death sentence set aside based on evidence available to the trial court, but not the sentencing jury. Code § 19.2-264.5 allows the trial judge to set aside the sentence recommended by the jury and impose a sentence of life "upon good cause shown." In addressing this assignment of error, then, we must review the trial court's conclusion that it "did not see anything which would justify disturbing the penalty which has been recommended by the jury," and its imposition of the death penalty.

The evidence before the trial court at the sentencing hearing consisted of Chandler's mitigation evidence, the post-sentence report, a victim impact statement, and the testimony of a deputy sheriff and the probation officer who prepared the post-sentence report.

Deputy Sheriff Keith Tribble testified that, following Chandler's conviction and jury sentencing, Chandler stated that, because he was portrayed as the "baddest" man in Halifax County, he needed to act as such. Chandler told Tribble that he would kill anyone who did something to hurt him and would do it slowly so they would suffer. The post-sentence report indicated that Chandler had problems with both drugs and alcohol, had dropped out of school, and had left the Job Corps to avoid dismissal for fighting. Chandler's prior criminal history included juvenile offenses of breaking and entering, disorderly conduct, and assault and battery. As an adult, Chandler continued his pattern and was convicted of disorderly conduct, robbery, and use of a firearm in the commission of that robbery. The robbery and firearm convictions occurred six months prior to the crimes involved in this case. During his confinement on those convictions, Chandler was also charged with an assault on another inmate. That charge was *nolle prossed*, but resulted in Chandler's segregation from the other inmates.

The trial court also heard Fernandez's testimony during the jury sentencing hearing that Chandler stated he would wear the used bullet casing from Dix's murder on a chain around his neck, and that if anyone went to the police about the robbery and murder "they wouldn't live to see [the] Court date."

Chandler's mitigation evidence included his direct testimony, in which he stated that he had nightmares about Dix, was taking medication for stress, had not seen his father for several years,

and that his mother had recently died of cancer. One other witness testified on Chandler's behalf. Ralph B. Hayes testified that he had known Chandler since Chandler was in grade school and that he was the pastor of the church Chandler had attended. In considering whether to set aside the jury sentence of death, the trial court characterized Chandler as having presented "little or no evidence of a mitigating nature."

Based on the evidence presented, we cannot conclude that the trial court erred in its conclusion that there was insufficient "good cause shown" to set aside the jury verdict of death and impose a sentence of life imprisonment.

## VII. Statutory Review

Pursuant to Code § 17-110.1, we must review Chandler's death sentence to consider and determine whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Chandler does not provide any examples of passion, prejudice, or any other arbitrary factor influencing the imposition of his death sentence and our review of the record finds none. We conclude, therefore, that the death sentence was not imposed as a result of any passion, prejudice, or any other arbitrary factor.

Chandler does argue, however, that imposition of the death penalty in this case is disproportionate and excessive.

In conducting the proportionality review, the applicable test is "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." *Jenkins v. Commonwealth*, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), *cert. denied*, 507 U.S. ____, 113 S.Ct. 1862 (1993). Chandler provided a synopsis of the crimes and criminal histories of 18 individuals sentenced to death based on the predicate of future dangerousness and 30 persons receiving that sentence based on both the future dangerousness and vileness predicates. Chandler argues simply that his "case and background pale by comparison" with the cases he cited.

We, like Chandler, compile and review capital murder cases in the course of conducting the proportionality portion of the statutory review process. In addition to the cases cited by Chandler, we

review all capital cases, including those in which a life sentence was imposed. Our proportionality review, however, is not a comparison of the perceived degrees of potential future dangerousness of this defendant and others convicted of similar crimes, as Chandler suggests. Rather, a finding of future dangerousness simply delineates the category of case in which a sentence of death was imposed that we will use for comparison purposes.

In this case, we give particular attention to those crimes which involved murder with a firearm in the course of a robbery under circumstances similar to those here. Sentencing bodies in this Commonwealth have often imposed the death penalty where the victim was a store clerk, was unarmed, provided little or no resistance, and was killed at literally point blank range. Common to each such murder is a cruelty and lack of respect for human life which is independent of the perpetrator's prior activities or other factors. *Chichester v. Commonwealth*, 248 Va. 311, 448 S.E.2d 638 (1994), *cert. denied*, ____ U.S. ____, 115 S.Ct. 1134 (1995); *Dubois v. Commonwealth*, 246 Va. 260, 435 S.E.2d 636 (1993), *cert. denied*, ____ U.S. ____, 114 S.Ct. 1389 (1994); *Townes v. Commonwealth*, 234 Va. 307, 362 S.E.2d 650 (1987), *cert. denied*, 485 U.S. 971 (1988); *Peterson v. Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983). Chandler's actions share this commonality. Furthermore, mitigating circumstances generally have been a factor in instances where similar crimes have received the lesser penalty. *See, e.g., Bowling v. Commonwealth*, 12 Va. App. 166, 403 S.E.2d 375, *appeal denied*, No. 910698 (Va. Aug. 7, 1991); *Fine v. Commonwealth*, *appeal denied*, No. 1087-90-2 (Va. Ct. App. Nov. 8, 1990), *appeal denied*, No. 901609 (Va. March 8, 1991). Based on our review, we conclude that the imposition of the death penalty in this case is neither excessive nor disproportionate to the penalty imposed in comparable cases.

## VIII. Conclusion

We find no reversible error among the issues presented by Chandler's appeals. Having conducted the review mandated by Code § 17-110.1, we decline to commute the sentence of death. Accordingly, we will affirm the judgments of the trial court.

Record No. 940975—*Affirmed.*
Record No. 940976—*Affirmed.*