COURT OF APPEALS OF VIRGINIA

Present:  Judge Annunziata, Senior Judge Duff and
          Retired Judge Kulp[*]
Argued at Alexandria, Virginia


TANYA L. DRUMMOND

                                    MEMORANDUM OPINION[**] BY
v.    Record No. 0903-99-1          JUDGE JAMES E. KULP
                                         JUNE 6, 2000
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
                    James A. Cales, Jr., Judge

          S. Jane Chittom, Appellate Counsel (Dianne G.
          Ringer, Senior Assistant Public Defender, on
          brief), for appellant.

          Stephen R. McCullough, Assistant Attorney
          General (Mark L. Earley, Attorney General, on
          brief), for appellee.


     Tanya L. Drummond (appellant) was convicted by a jury of

first degree murder.  On appeal, appellant contends the trial

court committed reversible error:  (1) by overruling appellant's

Batson challenge to the Commonwealth's peremptory strike of juror

Pamela Knox; (2) by refusing to grant appellant's jury

instructions on heat of passion and the lesser-included offense of

voluntary manslaughter; and (3) in finding the evidence sufficient

---

     [*] Retired Judge James E. Kulp took part in the consideration
of this case by designation pursuant to Code § 17.1-400,
recodifying Code § 17-116.01.

     [**] Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

to convict her of first degree murder.  We disagree and affirm appellant's conviction.

## I.

## THE BATSON CHALLENGE

During jury selection, the Commonwealth exercised one of its peremptory strikes to remove Pamela Knox, an African-American female, from the jury panel.  The trial court found that appellant had established a prima facie showing that the peremptory strike was made on the basis of race, and required the Commonwealth to explain the strike on some race-neutral basis.  The Commonwealth advised the court that appellant had attended the Portsmouth public schools and that Knox was employed by the same school system.  Although Knox did not indicate that she knew appellant, the Commonwealth expressed concern that a problem might nevertheless arise during the trial.  The trial court found that the Commonwealth had presented a non-pretextual, race-neutral reason for striking Knox, and overruled appellant's challenge to this strike.

The United States Supreme Court has held that a prospective juror may not be removed by peremptory strike solely on the basis of race.  See Batson v. Kentucky, 476 U.S. 79, 89 (1976).  Where a defendant makes out a prima facie case that a peremptory strike is based upon race, it is then incumbent upon the prosecutor to produce explanations for striking the juror that are race-neutral.  See Buck v. Commonwealth, 247 Va. 449, 450-51, 443 S.E.2d 414, 415

-

(1994).  "If the explanation is based upon factors other than the juror's race, it is deemed to be race neutral."  Kasi v. Commonwealth, 256 Va. 407, 421, 508 S.E.2d 57, 65 (1998), cert. denied, 119 S. Ct. 2399 (1999).  A defendant may challenge any race-neutral reason offered by the prosecutor as being pretextual, and the trial court must determine whether the defendant has carried her burden of proving purposeful discrimination by the prosecutor.  See Buck, 247 Va. at 451, 443 S.E.2d at 415.

> A "trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" . . . . This standard of review logically recognizes the trial court's unique opportunity to observe and evaluate "the prosecutor's state of mind based on demeanor and credibility" in the context of the case then before the court.

Robertson v. Commonwealth, 18 Va. App. 635, 639, 445 S.E.2d 713, 715 (1994) (citations omitted).  Thus, "[o]n appeal, the trial court's findings will be reversed only if they are clearly erroneous."  Buck, 247 Va. at 451, 443 S.E.2d at 415.

"[T]he issue is the facial validity of the prosecutor's explanation."  Hernandez v. New York, 500 U.S. 352, 360 (1991) (plurality opinion).  See Goodson v. Commonwealth, 22 Va. App. 61, 81, 467 S.E.2d 848, 858 (1996) (holding that "[a]ge, education, employment, and demeanor during voir dire may constitute race-neutral explanations for a peremptory strike").  It is not necessary that the prosecutor's explanation be

-

persuasive, or even plausible.  See Purkett v. Elem, 514 U.S. 765, 767-68 (1995).

The Commonwealth here offered a race-neutral reason for the peremptory strike.  As explained by the prosecutor, the basis for the strike was the potential that during the trial something might spark some recollection by Juror Knox of a prior relationship with appellant.  Such a circumstance could have posed a problem during the trial.  And appellant failed to meet her burden of showing that the prosecutor's explanation was pretextual.[1]  Accordingly, the trial court did not err when it denied appellant's Batson motion.

## II.

### JURY INSTRUCTIONS

The trial court instructed the jury on both first and second degree murder.  The court refused, however, to grant appellant's jury instructions on heat of passion and the lesser-included offense of voluntary manslaughter.  We need not address whether the trial court erred by rejecting the proffered instructions, for if any error occurred, it was harmless.

In Turner v. Commonwealth, 23 Va. App. 270, 476 S.E.2d 504 (1996), aff'd, 255 Va. 1, 492 S.E.2d 447 (1997), we addressed the issue of harmless error in the context of a trial court's

---

[1] Appellant pointed out that the Commonwealth did not strike a white female employed by the Chesapeake School System.  The record contains no evidence, however, indicating that this juror potentially knew appellant.

-

refusal to instruct a jury on voluntary manslaughter where the jury ultimately convicted the defendant of first degree murder. We concluded that

> where the reviewing court is able to determine that the trial court's error in failing to instruct the jury could not have affected the verdict, that error is harmless. Such a determination can be made where it is evident from the verdict that the jury would have necessarily rejected the lesser-included offense on which it was not instructed.

Id. at 276, 476 S.E.2d at 507.

In finding that the trial court's failure to instruct the jury on voluntary manslaughter constituted harmless error, we explained:

> In convicting appellant of first degree murder, the jury rejected the lesser-included offense of second degree murder. In so doing, the jury found beyond a reasonable doubt that appellant acted not only maliciously, but also willfully, deliberately, and premeditatedly. Homicide committed pursuant to a preconceived plan is not voluntary manslaughter; premeditation and reasonable provocation cannot co-exist. The verdict reached by the jury here compels the conclusion that it would never have reached a voluntary manslaughter verdict. Therefore, we conclude that the jury in this case, by rejecting the lesser-included offense of second degree murder, necessarily rejected the factual basis upon which it might have rendered a verdict on the lesser-included offense of voluntary manslaughter.

Id. at 277-78, 476 S.E.2d at 508 (citations and footnotes omitted).

-

The jury's finding that appellant was guilty of first degree murder compels a conclusion that it would not have convicted her of voluntary manslaughter even if instructed on that lesser offense. Accordingly, any failure to instruct on heat of passion and voluntary manslaughter was harmless.

### III.

### SUFFICIENCY OF THE EVIDENCE

Although appellant concedes she was responsible for the death of thirty-month-old Benita Godsey, she contends the evidence was insufficient to prove that she acted with premeditation.

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (citation omitted). "The credibility of the witnesses, the weight accorded testimony, and the inferences to be drawn from proven facts are matters to be determined by the fact finder." Stover v. Commonwealth, 31 Va. App. 225, 228, 522 S.E.2d 397, 398 (1999). The role of this Court is not to "substitute its judgment for that of the trier of fact." Hunley v. Commonwealth, 30 Va. App. 556, 559, 518 S.E.2d 347, 349 (1999). "The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it." Traverso v. Commonwealth, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988).

-

Thomas Boone testified that he lived with appellant and his daughter Benita in Room 122 of the London Boulevard Motel. Appellant had been living with Boone for one and a half years. She was Benita's primary caregiver and the only mother Benita had ever known.

On January 13, 1998, Boone was scheduled to work at 5:00 p.m., and appellant was going to have to stay home with Benita while he was away. Benita had been fussy all day, and appellant and Boone argued heatedly that afternoon because appellant wanted to go out with a friend that night. Boone testified, however, that appellant subsequently calmed down and that appellant and Benita were watching television together when he left for work.

Bernard Robertson, who worked at the motel, testified that around 7:00 p.m. he heard the "[s]ound of beating with a belt" and the cries of a baby emanating from Room 122. Between 9:00 and 9:30 p.m., appellant exited the room and asked Robertson for thirty-five cents to make a telephone call. She then proceeded to a nearby payphone. Robertson described appellant as upset, but not crying.

Paramedics John Wannamaker and Brian Bock responded to appellant's residence at 9:45 p.m. They found Benita lying in her crib unconscious and not breathing. Wannamaker described appellant as unemotional and testified that she pointed to Benita saying "'There's the child. I'm not sure what's wrong

-

with it.'"  Bock testified that appellant was initially unresponsive when he asked her about Benita's medical problems and about some medication that was in the room.  But she became hysterical and started crying "'My baby; my baby,'" when he asked her what had happened to Benita.

The paramedics were unable to resuscitate Benita, and she was pronounced dead shortly after arriving at the hospital.

Assistant Chief Medical Examiner Dr. Elizabeth Kinnison testified that Benita died from acute head injuries.  She stated that a "tremendous force" would have been required to inflict the fatal injuries and that "something happened more than once." Dr. Kinnison opined that Benita's fatal injuries could have been caused by the child's head striking a dresser or a crib.

Benita had bruising around her eyelids, four bruises on her chest, eight to ten bruises on her back, eight bruises on one of her arms, and fifteen bruises on her left leg.  She also had bruises on her scalp and a subdural hemorrhage.  Dr. Kinnison testified that these injuries had been inflicted at or shortly before the time of death.  Most of the injuries, including the fatal injuries, were inconsistent with having been caused by Benita falling down from a standing position.  Dr. Kinnison further testified that merely striking the child with an open hand would not have caused the fatal injuries.

At the time the fatal injuries were inflicted, Benita was wearing a cast that wrapped around her waist and encased her

-

right leg.  The cast was described as "dirty, foul-smelling" and soaked in urine.  Bock said Benita was unclean and she was suffering from skin ulcers where the edge of the cast rubbed against her skin.

Appellant provided two statements to the police regarding Benita's death.  On January 14, 1998, appellant told Detective Bond that she had put Benita to bed in her crib at 8:00 p.m. the night before.  She said she heard Benita stir around 8:30 p.m., but when she checked on the child at 9:00 p.m., Benita was unresponsive.  Appellant advised Bond that she then called the police.

On January 20, 1998, appellant told Bond that Benita was whining after she put the child to bed so she hit Benita in the face with her hand.  Benita continued crying so appellant picked her up and shook her.  Appellant told Bond that she hit Benita again on the head with her hand and then threw Benita into the crib.  Shortly thereafter, she noticed that Benita was unresponsive and called an ambulance.  Appellant denied striking Benita with any object, although she subsequently admitted that Benita's head struck the dresser and that the child's head could have struck the crib rail and the metal mattress frame on an adjacent bed.

> To prove premeditated murder, the Commonwealth must establish:  "(1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and

-

> (3) the performance of that act with malicious intent." Premeditation requires the formation of the specific intent to kill.

_Archie v. Commonwealth_, 14 Va. App. 684, 689, 420 S.E.2d 718, 721 (1992) (citation omitted). "The question of premeditation is a question to be determined by the fact-finder." _Bowling v. Commonwealth_, 12 Va. App. 166, 173, 403 S.E.2d 375, 379 (1991).

"Premeditation need not exist for any specific length of time," _Chandler v. Commonwealth_, 249 Va. 270, 280, 455 S.E.2d 219, 225 (1995), and may be proven by circumstantial evidence, see _Rhodes v. Commonwealth_, 238 Va. 480, 486, 384 S.E.2d 95, 98 (1989). In determining whether a defendant acted with premeditation

> the jury may properly consider the brutality of the attack, and whether more than one blow was struck; the disparity in size and strength between the defendant and the victim; . . . and the defendant's lack of remorse and efforts to avoid detection. While motive is not an essential element of the crime, it is relevant and often most persuasive upon the question of the actor's intent.

_Epperly v. Commonwealth_, 224 Va. 214, 232, 294 S.E.2d 882, 892 (1982) (citations omitted).

We found sufficient evidence of premeditation under similar facts in _Archie_, 14 Va. App. 684, 420 S.E.2d 718. In that case, the defendant was convicted of beating to death her boyfriend's three-year-old daughter. Citing to _Epperly_, we noted the evidence proved that the child-victim had sustained numerous

-

injuries at the hands of the defendant, the defendant had lied about how the victim sustained her injuries, and the defendant had shown no remorse over the child's death.  See Archie, 14 Va. App. at 689-90, 420 S.E.2d at 721.  There was also evidence tending to establish a motive for the defendant to harm the victim.  See id. at 690-91, 420 S.E.2d at 722; cf. Rhodes, 238 Va. at 487, 384 S.E.2d at 99 (finding insufficient evidence of premeditation where the defendant killed her three-month-old daughter with multiple blows, but where the defendant had consistently expressed remorse over the child's death, she had not attempted to avoid detection or blame, and there was no evidence of motive).

The evidence in the present case was sufficient to allow the jury to infer beyond a reasonable doubt that appellant acted with premeditation.  Appellant killed thirty-month-old Benita, who at the time was wearing a cast for a broken leg, with numerous blows administered with "tremendous force."  Although appellant subsequently expressed remorse over Benita's death, when the paramedics first encountered appellant she was unemotional and referred to the child as "it."  Appellant's failure to mention in her January 14 statement to Bond that she had struck Benita on the night of the child's death evidenced a desire to avoid responsibility for Benita's death.  Finally, appellant's anger about having to stay home with Benita that night instead of going out with a friend, and her desire to

-

quiet the child tended to prove the existence of a motive to harm Benita.

For the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.