**Norfolk**

HERBERT GARRISON FISHER, s/k/a

HERBERT GARRISON FISHER, JR.

v.

COMMONWEALTH OF VIRGINIA

No. 1283-91-1

Decided June 8, 1993

448

▮▮▮▮▮▮
▮▮▮▮

▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮

COUNSEL

Matthew N. Ott (Matthew N. Ott, P.C., on briefs), for appellant.

Michael T. Judge, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**WILLIS, J.**—On appeal from his jury trial conviction of second degree murder of his wife, Kathryn Ann Youngs Fisher (Kay), Herbert Garrison Fisher contends that the trial court erred (1) when it denied his motions to strike the Commonwealth's evidence and to set aside the jury verdict because the prosecution had failed to prove the *corpus delicti*, (2) when it denied his motion for a change of venue, but ordered the jury summoned from Lancaster County to trial in Gloucester County, (3) when it failed to ensure that the jury panel list had been made available to counsel forty-eight business hours before trial, (4) when it permitted the prosecution to cross-examine him on matters beyond the scope of direct examination and on matters without any evidentiary foundation, and (5) when it refused to recuse William Shaw, III, the Commonwealth's Attorney, thereby precluding Fisher from calling Mr. Shaw as a witness. We find no error and affirm the judgment of the trial court.

> When considering the sufficiency of the evidence on appeal of a criminal conviction, we must view all the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom. The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it.

*Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988) (citations omitted).

Fisher and Kay were married in 1984. They rented a cottage on the home property of Dr. Edward S. Bear abutting the Ware River in Gloucester County. In late fall, 1986, Dr. Bear's fiancee told Fisher that she and Dr. Bear would be out of town New Year's weekend. On December 20, 1986, Fisher and Kay attended Dr. Bear's Christmas party. The Gloucester County Commonwealth's Attorney, William H. Shaw III, also attended. The fact that the Bears were leaving for New Year's weekend became known to the guests during the party.

At 11:37 p.m. on January 2, 1987, Fisher called 911, reporting that his wife had fallen off their pier. Emergency personnel responded. Fisher told Gloucester Fire and Rescue Squad Captain Harry M. Healy, Jr. that Kay had gone outside to dump a bucket of ashes from the woodstove, but had not returned, and that he thought he had seen her body in the water. One of the rescue workers found a bucket full of ashes in about three feet of water next to the pier. At 12:17 a.m., rescue workers found Kay's body floating in the river, and Sergeant Walker of the Gloucester County Sheriff's Department so informed Fisher. While returning to the pier, the rescue workers held the body alongside the boat. Later, they placed it on the boat's forward deck. Upon arriving at the pier, the rescue workers found no sign of life and Dr. Brown, the local medical examiner, pronounced Kay dead.

While in the Fisher cottage, Officer Bell noticed unfolded laundry on the daybed. He also noticed that the woodstove was clean, the logs inside being only slightly burned. The fire shovel was also clean.

After the emergency personnel left, Fisher asked his friend, Dave Hazzard, to help search around the pier for the bucket. Fisher said that he found Kay's glasses in the water next to the pier. There was testimony that she wore them all the time.

The next day, Fisher told Officers Strigler and Walker that he and Kay had spent the day in Norfolk and had returned to the cottage about 9:30 p.m. The night was cold. Around 10:00 p.m., Kay asked him to build a fire. Kay said that she would clean the ashes out of the stove while he went outside to the woodpile. He returned from the woodpile with wood, built a fire, and watched television. He assumed that Kay had gone outside to dump the ashes from the stove. After thirty to forty-five minutes passed and Kay did not return, he went outside to look for her. Finding nobody at the main residence, he returned to the cottage to get a spotlight and continued his search. Spotting something floating in the water, he drove his truck to the water's

edge and shined its headlights on the object. It looked like Kay's jacket, so he returned to the cottage and called 911. Fisher initially stated that Kay was covered by a $10,000 life insurance policy, but upon further questioning, said that the policy might be for $100,000. During the interview, the officers noticed two fresh scratches on Fisher's hands.

An autopsy performed by Dr. Marcella Fierro revealed bruises on Kay's left wrist and hand, her right hand, her upper left thigh, her left knee, her ankles, and the top right side of her head. Dr. Fierro determined that the bruises occurred "prior to or about" the time of death and did not result from ordinary handling of the body or from its resting against objects. She concluded that asphyxia caused Kay's death. She eliminated drowning, crushing, strangulation, laryngospasm (a vocal chord spasm which obstructs the airway), and "dry drowning" (death before or upon entering the water without signs of drowning) as causes of the asphyxia. Dr. Fierro determined that Kay took her last breath and her heart stopped beating before she entered the water.

A second forensic pathologist, Dr. Davis, reviewed the medical evidence and likewise concluded that Kay died of asphyxia. He also eliminated drowning and laryngospasm as causes of death. He eliminated drug overdose, obstruction of the airway by food, and epilepsy as causes of death. Like Dr. Fierro, Dr. Davis concluded that Kay's death occurred prior to her entry into the water. .

Dr. Brown, the local medical examiner, testifying on Fisher's behalf, stated that Kay died of asphyxiation resulting from a laryngospasm.

Before the trial began, Fisher moved to recuse the Commonwealth's Attorney William Shaw, III on the ground that Mr. Shaw's testimony regarding the Bears' New Year's day plans allegedly announced at the Christmas party might contradict Dr. Bear's testimony. The trial court denied this motion. Fisher also moved for a change of venue. The trial court denied this motion also, but granted a change in venire and ordered that the jury be brought in from Lancaster County.

During the trial, Catherine Youngs, Kay's mother, testified that when Fisher visited her in New York on January 3, 1987, he told her that he did not know whether Kay had any life insurance. She testified that when she visited Fisher on the weekend of January 17, 1987, he

told her that he "hadn't come across anything" involving any insurance policies. However, on January 16, 1987, Fisher wrote the attorney for Kay's estate, listing five insurance policies totaling $710,000. Approximately two months later, Fisher told Mrs. Youngs that there was only $10,000 insurance.

At trial, Fisher testified that he and Kay did not return home from Norfolk until 10:00 p.m. Once inside, they decided that Fisher, after doing a few chores, would take a bath while Kay finished some laundry. He went outside to get wood while Kay started the fire. Upon his return, he saw Kay busy at the woodstove, apparently removing the ashes. About 10:30 p.m. he went upstairs to bathe and left Kay folding clothes and placing them on the daybed. About 11:00 p.m., he returned downstairs and did not see Kay. He went outside looking for her, but returned inside to put on warmer clothes. He grabbed a spotlight, went back outside, and searched various places. Eventually, he looked out over the water near the pier and saw what appeared to be Kay's coat. He shined his truck lights on the water, but could no longer locate the object. He then tried to use Dr. Bear's dinghy but could not drag it to the shore because it was full of water. He called 911 for help, and then continued to pull the dinghy toward the water.

Dr. Bear testified that the dinghy was upside down when he left for the weekend.

Karen Swisher Castanes, a student at Mary Washington College, testified that she met Fisher in October, 1986 at a meeting in Fredericksburg and joined him for dinner. They later went on an archeological survey of a site in Leesburg. Around December, 1986, Fisher drove Ms. Castanes to Fairfax, where she took an examination. He visited with her at her parents' home in Lynchburg while he conducted another archeological survey. He took her out to dinner in Lynchburg. He bought her a dress for Christmas. He told her that he was interested in her and wanted to continue dating her. He did not tell her that he was married.

Ms. Castanes testified that around January 2, 1987, Fisher called and told her that he was in New York on business. When she returned to school the first week of January, Fisher met her for dinner. In late January or early February, Fisher mentioned, for the first time, that he had been married and that his wife had passed away. At that time he told her that he was falling in love with her. In March, Ms. Castanes heard from a professor that Fisher's wife had just recently drowned.

Thereafter, she refused to see him. However, he continued to pursue the relationship, inviting her to his house for spring break, attempting to see her at her parents' home, and approaching her between classes at school.

## I. *Proof of the Corpus Delicti*

At the conclusion of the Commonwealth's evidence, Fisher moved that the evidence be struck and the charges against him dismissed on the ground that the Commonwealth had failed to prove the *corpus delicti*. The trial court denied that motion. After the jury verdict finding him guilty, Fisher moved, on the same ground, that the verdict be set aside and the charges against him dismissed. The trial court likewise denied that motion. Fisher assigns error to both rulings. He argues that the Commonwealth failed to prove that Kay's death resulted from criminal agency.

> Direct evidence is not essential to prove the *corpus delicti*. It may be proved by circumstantial evidence.

*Lane v. Commonwealth*, 219 Va. 509, 514, 248 S.E.2d 781, 783 (1978). Because the Commonwealth proved its case wholly by circumstantial evidence,

> all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. Nevertheless, it is within the province of the jury to determine what inferences are reasonably related to those facts. The burden is upon the Commonwealth to prove beyond a reasonable doubt that motive, time, place, means, and conduct concur in pointing out the accused as the perpetrator of the crime.

*Inge v. Commonwealth*, 217 Va. 360, 366, 228 S.E.2d 563, 567-68 (1976); *see also Stamper v. Commonwealth*, 220 Va. 260, 272, 257 S.E.2d 808, 817 (1979), *cert. denied*, 445 U.S. 972 (1980).

The evidence sufficiently proved that Kay's death resulted from another's criminal act. The medical evidence established that she died of asphyxiation before she entered the water. Premortem bruises on her hands, wrist, thighs and ankles, inflicted at the time of her death, proved that she had been subjected to violence. These bruises were caused by great force at the time of her death, and the four linear

bruises on her left wrist, consistent with finger marks, support the inference that they were inflicted by another person.

The circumstantial evidence sufficiently proved beyond a reasonable doubt motive, time, place, means, and conduct which concur in pointing to Fisher as the perpetrator of the crime.

The evidence linked Fisher directly to the offense. By his own admission, he was the only person on the scene at the time and place of Kay's death. No evidence suggests the presence of any other person. Fisher had fresh scrapes on his hands. Kay was a small woman. Fisher had, about the house, abundant means of suffocating her. The scrapes on his hands supported the inference that he had been involved in a struggle.

Kay's life was heavily insured. Fisher was enamored of Ms. Castanes. Thus, he was doubly motivated to procure his wife's death.

The ambiguity of Fisher's accounts supports the determination of his guilt. He gave conflicting stories as to the time he and Kay returned home and as to who was to build the fire. He told the investigating officers that Kay had been folding clothes, but the clothes were observed unfolded. When the officers returned the next day, they found the clothes folded. Fisher gave conflicting accounts of what he had been doing prior to becoming aware that Kay was not in the house. He gave a refuted account of being unable to use Dr. Bear's dinghy. He claimed to find Kay's glasses in a place that had been searched thoroughly by the officers.

The Commonwealth presented credible evidence as to each factor enumerated in *Inge*. This evidence was not only consistent with guilt, but excluded every reasonable theory of Fisher's innocence. The inference of his guilt was reasonable, justified, compelling, and left no reasonable room for doubt. *See Epperly v. Commonwealth*, 224 Va. 214, 228, 294 S.E.2d 882, 890 (1982).

## II. *Change of Venire*

■ Fisher next contends the trial court erred in denying his motion for a change of venue. He had been through an earlier trial, which resulted in a mistrial. He argues that extensive news coverage of the previous trial caused widespread prejudice against him in Gloucester County. Upon a showing of such prejudice, Code § 8.01-363 permits the trial court either to grant a change of venue or to summon jurors from another county or city. The trial judge's decision to avoid any possible prejudice by importing the venire from Lancaster County was a sound exercise of discretion. It clearly eliminated any possibility that Fisher would not be tried by a fair and impartial jury. *Voir dire* identified any prospective jurors who had pre-formed opinions based on pretrial publicity. Only 9.5% of the venire was struck for this reason. *See Ascher v. Commonwealth*, 12 Va. App. 1105, 408 S.E.2d 906 (1991), *cert. denied*, 113 S. Ct. 190 (1992); *Thomas v. Commonwealth*, 244 Va. 1, 419 S.E.2d 606, *cert. denied*, 113 S. Ct. 421 (1992).

### III. *Timely Provision of Jury List*

Fisher next contends that the trial court erred when it did not provide him with a second, supplemental jury list until after 4:00 p.m. on the Friday before the Monday trial date. He argues that, although he received the list more than forty-eight hours before the trial commenced, it was not received more than the forty-eight "business" hours before. He argues that this impaired his ability to investigate the jury panel members at the clerk's office and violated Code § 8.01-353. Fisher failed to object properly and sought no relief from the trial court. His counsel stated:

> Mr. Pollack [defense counsel]: If Your Honor please, I would like to get something on the record, if I may, please. We would like to inform the Court that we did not receive the second portion of the jury list until after 4:00 on Friday. We felt that was not within the statute. We would like to have that placed upon the record at this particular time.

> The Court: You are putting it down. So be it.

> Mr. Chettle [defense counsel]: Thank you.

Fisher failed to obtain a ruling from the court. He requested no relief. Because he was denied nothing by the trial court, there is no ruling for us to review. *Taylor v. Commonwealth*, 208 Va. 316, 324, 157 S.E.2d

185, 191 (1967); *see also Fisher v. Commonwealth*, 236 Va. 403, 414, 374 S.E.2d 46, 52 (1988), *cert. denied*, 490 U.S. 1028 (1989); *Hogan v. Commonwealth*, 5 Va. App. 36, 44, 360 S.E.2d 371, 376 (1987).

## IV. *Cross-Examination*

Fisher next contends that the Commonwealth's cross-examination of him exceeded the scope of direct, and that there was no evidentiary basis for the examination. During cross-examination of Fisher, the Commonwealth's Attorney asked whether he had placed fabric over Kay's face. The trial court overruled defense counsel's objection to this question. Fisher contends that the question exceeded the scope of direct examination because no evidence had been introduced supporting the inference that fabric had been placed over Kay's mouth or that Fisher was the criminal agent. We disagree.

██ "Once a defendant has testified as to certain matters, the proper scope of cross examination lies within the sound discretion of the trial court." *Mueller v. Commonwealth*, 244 Va. 386, 410, 422 S.E.2d 380, 395 (1992), *cert. denied*, 113 S. Ct. 1880 (1993) (citing *Savino v. Commonwealth*, 239 Va. 534, 545, 391 S.E.2d 276, 282, *cert. denied*, 498 U.S. 882 (1990)). The prosecutor's questions about the fabric related to the laundry that was described in direct examination. Fisher testified on direct examination that Kay was folding laundry the last time he saw her alive. Officer Bell testified that he saw unfolded laundry on the daybed the night of January 2, 1987. Officer Strigler testified that the laundry on the daybed was folded when he arrived the next morning. Identification of the cause of Kay's asphyxiation was an issue on trial. These circumstances, together with Fisher's denial of any knowledge of or involvement in Kay's death, rendered this question relevant, well founded, and within the scope of direct examination.

## V. *Recusal of the Commonwealth's Attorney*

Finally, Fisher contends that the trial court erred in denying his motion to recuse the Commonwealth's Attorney. He argues that Mr. Shaw was a potential exculpatory witness. He proffered to the trial court that Mr. Shaw did not hear the Bears' plans for New Year's weekend and that evidence of this could lend credence to Fisher's testimony that he was not aware that the Bears would be away. Mr. Shaw disputed this proffer. He represented to the trial court that he had heard Dr. Bear say at the Christmas party that he would be away. Mr. Shaw said that at the time of trial, he could not recall which weekend

Dr. Bear said that he would be away. However, he said that he would not testify that he had heard no such statement made. This supported the trial court's determination that Mr. Shaw's testimony would not be exculpatory of Fisher. Moreover, Dr. Bear's fiancee testified that after the invitations for the Christmas party were mailed, she told Fisher directly that she and Dr. Bear would be away for New Year's weekend.

Fisher further represented to the trial court that Mr. Shaw should be recused because he had a conflict of interest. He asserted that Mr. Shaw had represented Dr. Bear in a wrongful death suit arising out of Kay's death. The record does not support this assertion. Although Mr. Shaw had represented Dr. Bear on other matters, the wrongful death suit was defended by Dr. Bear's insurance company and was dismissed prior to commencement of the first trial of this case. *See Welsh v. Commonwealth*, 14 Va. App. 300, 314, 416 S.E.2d 451, 459-60 (1992); *Stamper v. Commonwealth*, 228 Va. 707, 714, 324 S.E.2d 682, 686 (1985).

We find no abuse of discretion in the trial court's denial of Fisher's motion to recuse the Commonwealth's Attorney. The judgment of the trial court is affirmed.

*Affirmed.*

Baker, J., and Koontz, J.,* concurred.

---

* When the case was argued, Judge Koontz presided. Judge Moon was elected Chief Judge effective May 1, 1993.