# COURT OF APPEALS OF VIRGINIA

Present    Chief Judge Decker, Judges Athey and White
Argued at Richmond, Virginia

KENNETH ALAN ROSE

v.        Record No. 0992-22-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE KIMBERLEY SLAYTON WHITE
NOVEMBER 14, 2023

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Steven C. McCallum, Judge

Kevin E. Calhoun for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Kenneth Alan Rose of forcible sodomy, attempted rape, four counts of

aggravated sexual battery, and two counts of indecent liberties. The trial court sentenced Rose to

130 years' incarceration, with 98 years suspended. Rose argues that "credible testimony from the

victims was necessary to prove any and all elements of the . . . charges, and that if the victims'

testimony was inherently incredible and unworthy of belief then none of the elements of those . . .

charges can be proven." While Rose acknowledges that he did not preserve his argument for

appellate review, he asks this Court to consider it under Rule 5A:18's ends of justice exception. We

find that Rose has not demonstrated that a manifest injustice has occurred; therefore, Rule 5A:18

bars this Court from considering Rose's argument for the first time on appeal. Accordingly, we

affirm the trial court's judgment.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In 2012, the appellant married Kelly Rose and moved into the family home with Kelly and her three minor daughters, A.M., K.M., and C.M. The girls considered Rose to be their father figure as their natural father was deceased. They called him "Dad." Rose helped pay bills and care for C.M., who was wheelchair bound and "fully disabled" after being hit by a car when she was three years old.

The three girls slept in a bunk bed in a room next to Kelly and Rose's bedroom. A.M. slept on the top bunk while K.M. and C.M. shared the bottom bunk. Beginning when A.M. was younger than twelve, Rose often entered the girls' bedroom around 5:00 or 6:00 a.m., pulled down A.M.'s pants, put his mouth on her vagina, and "rub[bed] his . . . penis" on her vagina. Sometimes, Rose ejaculated onto A.M.'s vagina, thigh, or stomach and "wipe[d] it off" with her sheets. When Rose and A.M. were alone, Rose kissed A.M. and touched A.M.'s breasts and vagina, both over and under her clothing. Rose also touched A.M.'s vagina with a "pink vibrator," touched the area between her breasts with his penis, and penetrated A.M.'s mouth with his penis once in the laundry room. A.M. testified that the abuse occurred "[a] lot," more than ten times, and Rose "bribe[d]" her by offering to "buy [her] something." Rose stopped abusing A.M. after she moved into her own room. A.M. did not report the abuse to an adult because her aunt had "lost her kids for the same reason" and she did not want to be "taken away from [her] mom."

K.M. similarly testified that from around the age of thirteen until she was seventeen, Rose entered her bedroom "[e]very night for as long as [she could] remember" and touched her with "[h]is hands and his mouth." He "[c]upped" her breasts, inserted his fingers inside her vagina, and touched the outside of her vagina with a vibrator "[q]uite a few times." In addition, Rose unsuccessfully tried to insert his penis into K.M.'s vagina more than once. When K.M. took baths, Rose came in and touched her all over her body. Along with the sexual abuse performed while in the bedroom and bathroom, Rose "touched" K.M. while in the basement. K.M. testified that once Rose took her to the laundry room and "made [her] use [her] mouth" on his penis. K.M. did not report Rose's abuse because she was "scared," "didn't know what would happen" to her, and was afraid of being taken from her mother.

On July 12, 2020, A.M. and Rose were arguing about the family's dog after Rose lifted the dog by its neck, pinned it against the wall, and threatened to "get rid" of it because the girls were not "cleaning up" after it. Following the argument, A.M. talked to K.M., and they reported Rose's abuse to Kelly because they "didn't want to live like that anymore" and "just couldn't do it anymore." Kelly initially did not believe her daughters' report and accused them of lying.

The girls then called Christina Riggins, their uncle's fiancée, and told Christina that Rose had been "touching [them] for years every night." Riggins described both girls as "hysterical" during the phone call. After A.M. reported what Rose had done, Riggins immediately drove to their house and, upon realizing that Rose was home and not leaving, took the girls to a nearby gas station.

When Rose later left the home, Riggins returned with the girls and persuaded Kelly to call the police. In response to the report, Chesterfield County Police Detective McGill arrived at the home and developed a safety plan with Kelly. Detective McGill did not speak with A.M. or K.M. since they had moved temporarily out of the house where Rose was; instead, he arranged for forensic interviews at a child advocacy center for July 17, 2020.

Detective McGill observed the interviews and subsequently returned to the house to retrieve the pink vibrator both girls had mentioned. Detective McGill did not send the vibrator for forensic analysis "due to the amount of time that [had] elapsed." He also did not collect the girls' "bedding" because K.M. reported during the interview that the last instance of abuse had been "a couple weeks" earlier. Detective McGill testified that, during the forensic interview, A.M. did not mention fellating Rose and did not mention any bribing by Rose.

At trial, A.M. admitted that she never cried for help during the abuse even though Kelly was in the adjacent bedroom. She also admitted that she did not tell Riggins about the abuse earlier, yet still testified to their close relationship. K.M. testified that she sometimes heard Rose getting into bed with A.M. and would "get up out of . . . bed, go in the bathroom, turn the lights on, . . . in hopes that he would stop." K.M. also testified that A.M. "look[ed] down" from the top bunk while Rose abused her more than once.

A.M. admitted that she and K.M. gave Rose a Father's Day card in 2020 containing adulatory references that their mother had purchased. Inside the card, A.M. wrote that Rose was the "best daddy ever"; K.M. wrote, "happy fathers [sic] day." K.M. also admitted that in 2016, while the abuse was ongoing, she posted on her Facebook page, "I love you so much mom and dad! I couldn't ask for better parents."

Rose moved to strike the evidence at the close of the Commonwealth's case-in-chief regarding only two charges of object sexual penetration, arguing that there was no evidence that Rose penetrated the girls with the vibrator. The trial court agreed and dismissed those charges. Rose then called Kelly, who testified that A.M. and K.M. typically went to bed around 1:00 a.m. Kelly described herself as a light sleeper and claimed she would have awoken if Rose left bed. Kelly testified that she confronted Rose after A.M. and K.M.'s allegations and he assured her that he would "never hurt" them "like that."

- 4 -

Kelly admitted that she had scheduled forensic examinations for A.M. and K.M. but cancelled the appointments because they did not "want to go." She identified several pictures depicting Rose and the girls together in various contexts and speculated that the girls may have fabricated the allegations because "[t]hey don't like discipline. They don't like being told what to do." Kelly admitted that she did not call the police immediately because she did not want to lose Rose, who was still her husband and helped support the family.

Rose did not make a motion to strike at the close of all the evidence. After argument by counsel, the jury convicted Rose of forcible sodomy, attempted rape, four counts of aggravated sexual battery, and two counts of indecent liberties. Rose appeals.

ANALYSIS

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. The rule "requires a litigant to make timely and specific objections, so that the trial court has 'an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals.'" *Brown v. Commonwealth*, 279 Va. 210, 217 (2010) (quoting *West v. Commonwealth*, 43 Va. App. 327, 337 (2004)). Rose concedes that his argument is not preserved for appeal[1] but asks this Court to address it under Rule 5A:18's ends of justice exception.

"The 'ends of justice' exception to Rule 5A:18 is 'narrow and is to be used sparingly.'" *Melick v. Commonwealth*, 69 Va. App. 122, 146 (2018) (quoting *Pearce v. Commonwealth*, 53

---

[1] Before the sentencing hearing, Rose filed a *pro se* motion to strike the jury's verdict. The trial court determined that it could not "consider or read" the motion because it was an "ex parte communication." Accordingly, the motion was never properly presented to or ruled upon by the trial court. *See Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010) (holding that when an appellant does not obtain a ruling from the trial court, "there is no ruling for [this Court] to review" and the argument is waived under Rule 5A:18 (quoting *Fisher v. Commonwealth*, 16 Va. App. 447, 454 (1993))).

Va. App. 113, 123 (2008)).  Whether to apply the ends of justice exception involves two questions: "(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice." *Commonwealth v. Bass*, 292 Va. 19, 27 (2016) (quoting *Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010)).  "The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt v. Commonwealth*, 66 Va. App. 199, 210 (2016) (en banc) (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 514 (2009)).

"[T]o invoke the ends of justice exception when sufficiency of the evidence has been raised for the first time on appeal, an appellant must do more than show that the Commonwealth *failed* to prove an element or elements of the offense." *Redman v. Commonwealth*, 25 Va. App. 215, 221 (1997).  "Otherwise, we would be required under the ends of justice exception to address the merits of every case where a defendant has failed to move to strike the Commonwealth's evidence as being insufficient to prove an element of the offense." *Id.* Instead, to establish that a miscarriage of justice has occurred, an "appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur." *Id.* at 222.

Rose argues that A.M. and K.M.'s testimony was so "inherently incredible and unworthy of belief" that the Commonwealth failed "to prove any and all elements of the eight charges."  He asserts that A.M. and K.M. had a "motive to lie" because they did not report the alleged abuse for years and instead waited until right after they had been in an argument with Rose about the family dog.  Rose emphasizes that K.M. initially refused to answer questions; he maintains that the normal family life, as shown by the Father's Day card and photographs, "negated the possibility" that he had abused the girls.

Rose argues that the girls' testimony included many inconsistencies and contradictions. He emphasizes that A.M. did not mention Rose's bribes or the oral sodomy during her forensic interview. Similarly, K.M. adamantly testified that Rose had orally sodomized her despite only telling the forensic interviewer that it was a possibility. Rose also points to various other alleged "inconsistencies" regarding how many times and at what time of night the abuse occurred, whether and how often Rose ejaculated, when the last incident of abuse occurred, and Kelly's sleeping habits. Finally, Rose asserts that no forensic or corroborative evidence supported A.M. and K.M.'s testimony.

By their express terms, Rose's arguments are merely attempts to demonstrate that "the Commonwealth *failed* to prove an element . . . of the offense[s]." *Redman*, 25 Va. App. at 221. Indeed, Rose points to nothing in the record affirmatively proving that an element of the offense did not occur or that he was convicted for non-criminal conduct. Furthermore, Rose is legally incorrect that the victims' testimony must be corroborated. *See Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004). Factfinders are "free to believe or disbelieve, in part or in whole, the testimony of any witness." *Id.* Thus, Rose's arguments are legally insufficient to invoke the ends of justice exception to permit us to consider his sufficiency argument raised for the first time on appeal. Here, the exception does not apply to Rose and Rule 5A:18 bars us from considering his argument.

## CONCLUSION

Having failed to preserve his sufficiency argument below or to satisfy the requirements of the ends of justice exception to Rule 5A:18, Rose is barred from seeking appellate review of his sufficiency challenge. Accordingly, we affirm the trial court's judgment.

*Affirmed.*