COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Huff, Athey and Fulton

JASON AARON BARD

MEMORANDUM OPINION*

v.     Record No. 1304-23-3

PER CURIAM
AUGUST 27, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF TAZEWELL COUNTY
Jack S. Hurley, Jr., Judge

(Laurie A. Conrad, on brief), for appellant.

(Jason S. Miyares, Attorney General; William K. Hamilton, Assistant
Attorney General, on brief), for appellee.

Following a bench trial, the Circuit Court of Tazewell County ("trial court") convicted Jason

Bard ("Bard") on two counts of forcible sodomy in violation of Code § 18.2-67.1. Bard assigns

error to the trial court for exercising jurisdiction as he contends the Commonwealth failed to

establish that the offenses occurred in Virginia. He further assigns error to the trial court for

finding the evidence sufficient to support his convictions. Finally, Bard assigns error to the trial

court for failing to dismiss the indictments when the statutory speedy trial period had been

violated pursuant to Code § 19.2-243. After examining the briefs and record in this case, the panel

unanimously holds that oral argument is unnecessary because "the appeal is wholly without merit."

Code § 17.1-403(ii)(a); Rule 5A:27(a). Finding no error, we affirm the trial court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

# I. BACKGROUND[1]

D.B.[2] had been physically and mentally abused by his parents since he was five years old. D.B. first met Bard when D.B. and his family lived in Georgia and Bard was dating D.B.'s older sister. After getting to know Bard, D.B. gained respect for Bard as the "only person that was nice to him." D.B. also thought of Bard as a "big role model" because he believed that Bard had formerly served in the Marine Corps and had also previously been a federal law enforcement officer. D.B. and Bard "kept in contact" and "h[ung] out" after Bard and D.B.'s sister ended their relationship. D.B. considered Bard a "brother."

In late 2019, D.B., who was then 13 years old, moved with his family from Georgia to Tazewell County, Virginia. Forty-one-year-old Bard also moved to Tazewell County in 2019, along with his live-in girlfriend Jessica Boyd ("Boyd"). D.B. visited Bard's residence in Virginia nearly every weekend to get away from his parents' continued abuse.

At trial, D.B. testified that after the relocation to Tazewell County, Bard "started acting weird." For example, D.B. testified that on one occasion when the water was not working at his parents' home, D.B. showered at Bard's residence. D.B. stated that after exiting the shower, Bard asked for permission to dry off his back when D.B. could not reach it. D.B. further testified that while Bard was drying off his back, Bard told D.B. to close his eyes whereupon D.B. "felt some[one] grab . . . the head of [his] penis," which "felt weird." D.B. also admitted that after

---

[1] On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[2] We use the victim's initials to protect his privacy since he was a minor at the time of the abuse.

leaving the bathroom, he spoke with both Bard and Boyd in their living room but failed to report the incident in the bathroom to Boyd.

D.B. also testified that during the following weekend at Bard's residence, Bard "dropped his pants and made" D.B. get on his knees. Bard then threatened D.B. with a firearm and warned him "if you tell anybody[] . . . I will shoot you." Next, Bard "put his penis in" D.B.'s mouth and D.B. then "had to suck" it. D.B. did not remember "how long that went on for," but when D.B. told Bard that he did not want to continue, Bard responded that he did not care. D.B. then complied because he was scared and did not "feel like [he] had a choice."

D.B. also testified concerning another incident when he and Bard were watching television at Bard and Boyd's residence. D.B. testified that Bard asked him to come outside onto the back porch, and after following Bard outside, D.B. "felt [his] pants being pulled down." Bard then started "sucking [D.B.'s] penis." D.B. stated that he "clos[ed] [his] eyes" because he "was scared." Bard again threatened to shoot D.B., and D.B. once more felt like he did not "ha[ve] a choice." D.B. testified that he believed that Bard "would physically hurt" him if he resisted and that he "was not capable of fighting a grown man" because he was only 13 at the time of the abuse.

Bard's physical and sexually abusive conduct first came to light in an investigation of D.B.'s allegations of parental abuse conducted in February of 2022 by Tazewell County Sheriff's Detective Brianna Baldridge ("Detective Baldridge"). During his interview with Detective Baldridge, D.B. disclosed that, in addition to the physical abuse he suffered at the hands of his parents, Bard had also sexually assaulted him. After this disclosure, the Tazewell County police arrested Bard. On April 12, 2022, the Commonwealth charged Bard with two counts of forcible sodomy, one count of attempted sodomy, and one count of strangulation.[3]

---

[3] The Commonwealth later nolle prossed the strangulation charge.

The Tazewell County Juvenile and Domestic Relations District Court ("the JDR court") subsequently found probable cause and certified the charges to the grand jury which met on September 6, 2022, and returned a true bill. The charges were originally set for a bench trial to be held on January 17, 2023. However, on January 3, 2023, the trial court continued the trial from January 17 to February 23, 2023, upon joint motion.

On February 8, 2023, Bard moved to dismiss the indictments as violative of his statutory speedy trial rights pursuant to Code § 19.2-243. In support of his motion, Bard asserted that he had "been in continued custody since April 12, 2022." He further contended that the JDR court had previously conducted a preliminary hearing and found probable cause to certify the charges to the grand jury on September 6, 2022. Bard also represented that during the January 3, 2023 pretrial conference, he "was informed that the [trial] [c]ourt had double booked [its] jury dates and therefore his trial would have to be moved." Finally, he concluded that his statutory speedy trial rights were violated because he "was prepared to have his trial on January 17, 2023." The record does not reflect that the trial court directly ruled on Bard's motion to dismiss.

At trial, D.B. also testified that when he lived in Georgia, he had called the local Georgia social services office and reported his parents' abuse, but that office did nothing to address the physical abuse. He further stated that after he moved to Tazewell County, the Tazewell County Department of Social Services "got involved" after he attended school with "bruises all over [his] face" and that it was their involvement that led to his eventual disclosure of Bard's alleged physical and sexual abuse.

During cross-examination, D.B. confirmed that Bard had put his penis in D.B.'s mouth on one occasion and, on another occasion, Bard put D.B.'s penis in his mouth. D.B. also described an additional incident when, after showering at Bard's residence, he "felt like [he] got pushed" in the bathroom. D.B. fell to the floor, and "when [he] rolled over," Bard was "standing over" him and

- 4 -

ejaculating. However, D.B. noted that Bard did not "put his penis anywhere on" D.B. during this incident. D.B. also reiterated that Bard had assaulted him at his residence in Tazewell County, not in Georgia. D.B. described Bard's residence as a trailer, and he recalled Bard using a converted metal storage container next to the trailer as an office and that the container bore a sign reading "Bio-hazard Department E5." D.B. also identified a picture of the trailer and container at trial. D.B. acknowledged that he continued to visit Bard's residence after the incidents until Bard was arrested. He explained that, although Bard made him "uncomfortable," he "didn't want to be around [his] parents and get hit."

D.B. also acknowledged that he had previously been admitted to a mental hospital for suicidal and homicidal thoughts and that he heard voices in his head "telling" him to "hurt" people, including his parents. He stated that he was taking multiple prescribed medications that made him feel "really tired" and "zombified." And he noted that he "smok[ed] weed and popp[ed] pills" at the time of the alleged offenses. The record also reflects that D.B. may have fallen asleep at some point during his lengthy trial testimony.

The Commonwealth next called Boyd who testified that she had been involved in an eight-year romantic relationship with Bard. She stated that they lived together for four years in Georgia before moving to a residence on Pounding Mill Branch Road in Tazewell County in 2019. She also testified that they shared the Virginia residence with Bard's friend Kevin Powell ("Powell"). Boyd also described a "metal looking container sitting in front of the trailer," and "there were bio-hazard signs" nearby.

Boyd confirmed that D.B. visited their residence "[m]ostly on weekends." She testified that she thought that D.B. feared Bard because D.B. "didn't want to be alone with him." She also testified that D.B. told her about "an incident inside the . . . trailer" when Bard "supposedly . . . went down on him." Boyd then stated that she told D.B. that he "should tell his mom" or "law

- 5 -

enforcement," but that Boyd moved away before he did so. Boyd also testified that, in 2020, Bard admitted to her that D.B. "went down on him," and he "went down on" D.B. Boyd further asserted that she never personally witnessed any sexual interactions between Bard and D.B.

After the Commonwealth rested its case-in-chief, Bard moved to strike the Commonwealth's evidence. In support thereof, Bard contended that D.B.'s testimony was inconsistent concerning the relevant events in question and that these discrepancies demonstrated that his account of what had occurred was untrue. Specifically, Bard contended that D.B. only referenced Bard's use of a firearm once despite "testifying about that particular instance on several occasions." Bard further argued that it was unclear from D.B.'s testimony whether the alleged acts of sodomy "even occurred in Virginia." The trial court struck one count of attempted forcible sodomy but denied the motions to strike the other two counts of forcible sodomy.

Bard's case-in-chief began with D.B.'s mother, Jennifer Ash ("Ash"). She testified that D.B. never told her that "anyone sexually assaulted him." She also testified that D.B. has "a tendency to tell stories" and that she knew he was "telling a story" whenever he "g[ot] quiet." Ash further stated that D.B. had previously "made . . . false allegations" pertaining to abuse[4] when their family lived in Georgia. She also confirmed that the family moved to Tazewell County in 2019, around the start of the school year and acknowledged that she was "facing criminal charges" "related to [D.B.] and [her] other sons."

Bard testified in his own defense, denying that he either engaged in fellatio with D.B. or made D.B. engage in fellatio with him. Bard further testified that he actually resided in Griffin, Georgia, but began traveling to Virginia in late 2019. He testified that when he visited Virginia, he would stay a "night to a few nights" at Powell's residence on Pounding Mill Branch Road in Tazewell County. Bard further testified that Boyd accompanied him on his trips from Georgia to

_____

[4] The record is unclear whether these "allegations" pertained to sexual abuse.

Virginia and that she sometimes remained at the Pounding Mill Branch residence after Bard returned to Georgia. Bard claimed that D.B. only visited Boyd and Powell at the Pounding Mill Branch residence. He also denied that D.B. ever visited Bard in Virginia and that he had never been alone with D.B. in Virginia.

Bard stated that he had "felt bad" for D.B. because he saw him as a "lost soul" and "the black sheep type." He denied that he had ever served in the armed forces or as a law enforcement officer and that he never told D.B. that he had. Rather, he "clean[ed] crime scenes" for a living. Bard also claimed that he witnessed D.B. and Boyd having sex in Georgia when D.B. was 12 years old.[5]

On cross-examination, Bard admitted that he had been previously convicted of possession of child pornography and "having intercourse with a minor." He also admitted to being previously convicted of forgery, theft, and battery. He acknowledged that he possessed a Virginia driver's license and that the driver's license listed the Pounding Mill Branch Road address as his residence.

At the close of all the evidence, Bard renewed his motion to strike, contending that D.B.'s testimony contained "enough inconsistencies" to "rise to the level of untruthfulness." Bard also asserted that it was unclear from D.B.'s testimony if the alleged events "occurred in Virginia or Georgia" and contended that the record contained no evidence of "force," "threat[s]," or "intimidation."

The trial court concluded that D.B.'s testimony was sufficient to prove the elements of forcible sodomy beyond a reasonable doubt. The court noted that D.B. described both acts of fellatio and testified that those acts "absolutely" were "against his will" and that he felt scared and intimidated by Bard's threats. Regarding jurisdiction, the trial court further noted that D.B. "was very clear" that the acts occurred in Tazewell County. The trial court then weighed the evidence

---

[5] Both D.B. and Boyd denied that they ever engaged in sexual activity.

before it and found that "the balance of credibility" "f[ell] on the side of D.B.," and denied the motion to strike before convicting Bard on both counts of forcible sodomy. The trial court observed that there was no "wavering" on D.B.'s part regarding the two acts of fellatio, but by contrast, the trial court found Bard's testimony "preposterous" and "unbelievable." On May 30, 2023, the trial court entered its final order sentencing Bard to 80 years' incarceration with 20 years suspended. Bard appealed.

## II. ANALYSIS

### A. Standard of Review

A challenge to the trial court's subject matter jurisdiction raises a legal issue that this Court reviews de novo. *See Riddick v. Commonwealth*, 72 Va. App. 132, 139 (2020).

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

- 8 -

Similarly, "[i]n cases involving statutory speedy trial issues, [this Court] gives deference to the trial court's findings of fact, but reviews *de novo* the trial court's interpretation and application of Code § 19.2-243." *Turner v. Commonwealth*, 68 Va. App. 72, 78 (2017).

*B. The record establishes that the trial court possessed subject matter jurisdiction.*

Bard contends that the trial court did not possess subject matter jurisdiction since the evidence reflected that the alleged crimes occurred in Georgia. We disagree.

"Every crime to be punished in Virginia must be committed in Virginia." *Jones v. Commonwealth*, 42 Va. App. 142, 146 (2004). The defendant's commission of the charged offense in Virginia speaks to the trial court's subject matter jurisdiction. *See Thomas v. Commonwealth*, 36 Va. App. 326, 333 (2001); *Owusu v. Commonwealth*, 11 Va. App. 671, 672-73 (1991); *see also* Code § 17.1-513 (granting circuit courts "original and general jurisdiction" of all criminal cases "in which an appeal may be had to the Court of Appeals"); Code § 19.2-239 (granting circuit courts "exclusive original jurisdiction for the trial of all presentments, indictments and informations for offenses committed within their respective circuits"). But proof of the trial court's territorial subject matter jurisdiction must appear on the face of the record. *Jones*, 42 Va. App. at 146.

Here, the evidence, viewed in the light most favorable to the Commonwealth, clearly established the trial court's territorial jurisdiction. D.B. unequivocally testified that Bard committed the charged acts of sodomy at Bard's residence in Tazewell County.[6] D.B. also described Bard's residence and identified a photograph of the Tazewell County residence at trial. In addition, both D.B. and Ash testified that their family moved from Georgia to Tazewell County in 2019, and the record is bereft of any evidence suggesting that D.B. or his family subsequently moved back to

---

[6] On brief, Bard asserts that D.B. testified that "he first made the report to Social Services in Georgia, and they did nothing." The record shows, however, that D.B.'s testimony about reporting abuse in Georgia referred to physical abuse allegedly inflicted by his parents, not to sexual abuse committed by Bard.

Georgia thereafter. Boyd further testified that she and Bard moved to the residence on Pounding Mill Branch Road in Tazewell County in 2019. Bard, testifying on his own behalf, even acknowledged that he possessed a Virginia driver's license that listed his residence at Pounding Branch Mill Road in Tazewell County, Virginia. Thus, the trial court did not err in exercising jurisdiction here since the record reflects that the criminal acts at issue occurred in Tazewell County, Virginia.

*C. The record contains sufficient evidence in support of Bard's convictions.*

Bard also contends that the evidence here was insufficient to sustain his convictions for forcible sodomy. In support of his contention, Bard claims that D.B.'s testimony failed to prove that the sodomy was accomplished by force or intimidation because: 1) D.B. did not testify that he resisted Bard; 2) D.B.'s testimony was inherently incredible; and 3) D.B. testified at trial in an impaired state of mind since the record reflects that he may have fallen asleep during his testimony. We disagree.

A defendant is guilty of forcible sodomy if he "engages in . . . fellatio . . . with a complaining witness" and that "act is accomplished against the will of the complaining witness, by force, threat or intimidation of or against the complaining witness or another person, or through the use of the complaining witness's mental incapacity or physical helplessness." Code § 18.2-67.1(A)(2). It is well established that "a conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Poole v. Commonwealth*, 73 Va. App. 357, 368 (2021) (quoting *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005)). "As we have noted, '[b]ecause sexual offenses are typically clandestine in nature, seldom involving witnesses to the offense except the perpetrator and the victim, a requirement of corroboration would result in most sex offenses going unpunished.'" *Id.* at 368-69 (alteration in original) (quoting *Wilson*, 46 Va. App. at 88).

Here, D.B. testified that on two separate occasions Bard forced him to engage in fellatio: the first time by placing his penis in D.B.'s mouth and on the second occasion by putting D.B.'s penis in his mouth. D.B. further testified that on each occasion he did not want to engage in fellatio with Bard but was afraid and thus had no choice because Bard was threatening him with a gun. Viewing this testimony alone in the light most favorable to the Commonwealth, the trial court could have and reasonably did conclude that Bard twice engaged in fellatio with D.B. against his will by force, threat, or intimidation.

Bard's contention that D.B.'s testimony was insufficient to prove forcible sodomy because D.B. failed to specifically testify that he resisted Bard's advances is also misguided. More than four decades ago, the General Assembly expressly abrogated the "reasonable resistance requirement that previously existed under Virginia law."[7] *Farish v. Commonwealth*, 2 Va. App. 627, 631 (1986); *see* Code § 18.2-67.6. Hence, the absence of resistance only remains relevant to the issue of whether the alleged sexual act was "against the will of the complaining witness." Code § 18.2-67.6.

Here, D.B. explained that he was afraid because of Bard's threats of violence, testifying that Bard used a firearm and made threats of "shoot[ing]" him to get D.B. to accede to his demands. Moreover, D.B. was 13 years old at the time of the offenses and reasonably testified that he did not believe that he could physically resist Bard, who was a 41-year-old man. Thus, viewing the evidence in the light most favorable to the Commonwealth, the trial court reasonably could have and ultimately did conclude that these acts of sexual abuse were committed against D.B.'s will.

Similarly, Bard's assertion that D.B.'s testimony was inherently incredible is also misguided. "[D]etermining the credibility of witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they

---

[7] The case from the Supreme Court of Virginia that Bard cites for the contrary proposition predates Code § 18.2-67.6. *See Jones v. Commonwealth*, 219 Va. 983 (1979); 1981 Va. Acts ch. 397.

- 11 -

testify." *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, this Court must accept 'the trial court's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Canada v. Commonwealth*, 75 Va. App. 367, 386 (2022) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). Hence, "we may only disturb the trial court's credibility determination if the evidence is 'inherently incredible, or so contrary to human experience as to render it unworthy of belief,'" *Lopez v. Commonwealth*, 73 Va. App. 70, 84 (2021) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)), because "evidence is not 'incredible' unless it is 'so manifestly false that reasonable [people] ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ,'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Here, there is nothing inherently incredible about D.B.'s testimony that Bard forcibly engaged in sodomy with him against his will on two separate occasions while at Bard's residence. Bard alleges that D.B.'s testimony was incredible since D.B. had admitted to lying in the past, and D.B.'s mother, Ash, also testified that D.B. had previously made false allegations and she could tell when he was lying. However, this testimony simply reflects Bard's attempts to impeach D.B.'s testimony and an attempt to impeach a witness's testimony "does not necessarily render [their] testimony unworthy of belief" by itself. *Juniper*, 271 Va. at 415. Rather, "[t]his circumstance is appropriately weighed as part of the entire issue of witness credibility, which is left to the jury to determine." *Id.* Hence, "[t]he credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009)). Thus, since the trial court heard all the evidence in this

- 12 -

case including the impeachment testimony elicited from D.B. and his mother, before finding D.B.'s testimony as a whole to be credible, we will not disturb that finding on appeal.

Finally, the fact that D.B. was tired and may have fallen asleep during his testimony does not render his testimony unworthy of belief. D.B. testified that he had taken several prescribed medications that made him feel tired. Further, Detective Baldridge testified that when she interviewed D.B. about his accusations against Bard, he did not appear lethargic or confused. Most importantly, the trial court, sitting as the factfinder, observed D.B.'s demeanor on the stand and weighed his credibility alongside all the other testimony, including Bard's. *See Lambert*, 70 Va. App. at 759. In the end, the trial court found D.B.'s testimony credible and Bard's testimony incredible; thus, there is no basis for this Court to disturb that credibility determination. Hence, we will also not disturb Bard's convictions.

*D. Bard's statutory speedy trial rights were not violated.*

Lastly, Bard contends that the Commonwealth violated his statutory speedy trial rights under Code § 19.2-243. We disagree.

Under Code § 19.2-243, "if a defendant, who stands accused of a felony, is continuously held in custody from the time he was indicted or from his preliminary hearing, he 'shall be forever discharged from prosecution for such offense if no trial is commenced in the circuit court within five months.'" *Young v. Commonwealth*, 297 Va. 443, 451 (2019) (quoting Code § 19.2-243). The statute also provides, however, that "the calculation of the time period for commencing the trial will be tolled for time attributed to a continuance granted on" the defendant's motion, or if the defendant concurs in or fails to object to the Commonwealth's motion. *Id.* at 451-52.

Before trial, Bard moved to dismiss the indictments, alleging that the five-month period mandated by Code § 19.2-243 ended on February 6, 2023. However, the record does not reflect

that the trial court ruled on his motion.  "Our review of an appeal is restricted to the record." *Oliver v. Commonwealth*, 35 Va. App. 286, 296 (2001).  When an appellant fails to obtain a ruling on his motion from the trial court, "'there is no ruling for [this Court] to review' on appeal, and his argument is waived under Rule 5A:18."  *Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010) (alteration in original) (quoting *Fisher v. Commonwealth*, 16 Va. App. 447, 454 (1993)).

Moreover, the record refutes Bard's assertion.  The JDR court found probable cause to certify the charges to the grand jury on September 6, 2022.  Thus, if uninterrupted, the five-month period in Code § 19.2-243 ran until February 6, 2023.  But on January 3, 2023, the trial court continued the trial from January 17 to February 23, 2023.  Critically, the trial court's order—signed by Bard's trial counsel—unambiguously reflected that it granted the continuance on the motion of both parties.  Accordingly, the provisions in Code § 19.2-243 did not apply to the period of time between January 3, 2023, and February 23, 2023.  Thus, Bard's pretrial detention and trial complied with Code § 19.2-243, and there was no basis for the trial court to dismiss the indictment for a violation of that section.

### III. CONCLUSION

For the foregoing reasons, we find no error.  Therefore, the trial court's judgment is affirmed.

*Affirmed.*